**GENERAL INSURANCE COMPANY OF AMERICA, and Interveners, Sherman L. Jones et al., Appellants,**

v.

**WESTERN FIRE & CASUALTY COMPANY, Appellee.**

**No. 16196.**

United States Court of Appeals
Fifth Circuit.

Jan. 31, 1957.

Rehearing Denied Feb. 26, 1957.

J. Carlisle DeHay, Jr., Dallas, Tex., Leachman, Gardere, Akin & Porter, Dallas, Tex., for appellants.

Jas. H. Milam, Lubbock, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

John R. BROWN, Circuit Judge.

Here, as now elsewhere so common, e. g., Continental Casualty Co. v. Suttenfield, 5 Cir., 236 F.2d 433, 435; United Services Automobile Ass'n v. Russom, 5 Cir., 241 F.2d 296, the traffic accident has become a mere incident to the vigorous battle between insurers, each of whom by a full use of fluid inconsistent defenses reminiscent of common law pleading disclaim all liability but then assert that another, not it, is liable. Maryland Casualty Co. v. Southern Farm Bureau Casualty Ins. Co., 5 Cir., 235 F.2d 679.

In that struggle, substituted for the forgotten circumstances of the occurrence are the collateral controversies, removed in time and distance, relating to the issuance of the policies, conduct and action of the assureds, underwriters, agents, application and construction of abstruse policy clauses, and the like.

So, it is here:[1] if Western's[2] policy was in force on the Jones Ford, it is liable for all. If not, then General,[3] under the drive-other-car extension of its policy bears the whole loss.

The District Court, in a non-jury trial, held that (a) Western's policy was void because of misrepresentations by Mrs. Jones and her son Sherman concerning ownership of the 1950 Plymouth; and

(b) the 1951 Ford was not a "newly acquired automobile" under Clause IV of the policy, note 2, supra.

Unlike Didlake v. Standard Insurance Co., 10 Cir., 195 F.2d 247, 33 A.L.R.2d 941, so much relied on by Western, where a willful, purposeful scheme was used to deceive both agent and company into believing that the named adult, rather than the minor for whom no insurance could

1. On April 23, 1953, the Jones' 1951 Ford, while driven by Mrs. Lola Jones Cutshall with the permission and consent of her mother, Mrs. Eunice V. Jones, and brother, Sherman Jones (then in the car), hit a bicycle injuring the two young Kuykendall boys. On the eve of the State Court trial of that dangerous suit against the Cutshalls and Sherman Jones, settlement for $8,750.00 was made. By express agreement, the ultimate liability of the two insurers was to be determined by subsequent litigation—the instant suit, brought by Western against General for declaration of rights. The Joneses and Cutshalls intervened, joining common cause with General who sought recovery by cross action.

2. Western Fire & Casualty Company, through its Texas Recording Agent Sam Hutson, issued a Standard Texas Combination Automobile Policy dated November 20, 1952, listing Eunice V. Jones as "name of insured" covering a 1950 Plymouth sedan. Sherman Jones, the son, on April 10, 1953, his twenty-first birthday, traded the 1950 Plymouth for the 1951 Ford. Within thirty days (but after the accident) Agent Hutson transferred the insurance to the Ford as a substitute vehicle under Section IV(a) (4) of the Policy: " * * * the word 'automobile' means:

"(4) Newly Acquired Automobile—an automobile, ownership of which is acquired by the named insured who is the owner of the described automobile, if the named insured notifies the company within thirty days following the date of its delivery to him, and if * * * it replaces an automobile described in this policy * * * The named insured shall pay any additional premium required because of the application of the insurance to such newly acquired automobile."

Mrs. Cutshall, under the Omnibus Clause, was an additional assured:

"With respect to the insurance for bodily injury liability and for property damage liability the unqualified word 'insured' includes the named insured and

also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission * * *."

3. General Insurance Company of America had issued its Standard Texas Policy to Lola Jones Cutshall (and husband) covering a 1953 Studebaker (in no way involved in the accident). It contained the usual drive-other-car coverage extension:

"V. Use of Other Automobiles: If the named insured is an individual who owns the automobile classified as 'pleasure and business' * * * such insurance as is afforded by this policy for bodily injury liability, for property damage liability and for medical payments with respect to said automobile applies with respect to any other automobile, subject to the following provisions * * * [none of which apply]".

But, General asserts, under the following policy provision, common to both policies, no liability would attach respecting Mrs. Cutshall's actions until other insurance (Western) available to Mrs. Jones as an additional assured was exhausted:

"18. Other Insurance—Coverages A, B, D, E, F, G, H, I and J: If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to temporary substitute automobiles under Insuring Agreement IV or *other automobiles under Insuring Agreement V shall be excess insurance over any other valid and collectible insurance available to the insured either as an insured under a policy applicable with respect to said automobiles or otherwise.*" (Emphasis supplied.)

be procured at all, was the sole owner and expected user of the car, this record compels the conclusion and reflects an underlying approach that if there were misrepresentation, it is so merely because of what the law attaches to conduct. For nowhere is there a suggestion that mother or son were knowingly misstating, or attempting to conceal, facts, or that Agent Hutson was misled by these long-time acquaintances or was consciously doing wrong. The mother, a widow running a farm with all of its chores, taking in washing, doing cleaning and other odd jobs for support of her family, and Sherman, the twenty-year-old son just returned from Korea with a 100% total disability rating for war-inflicted wounds, were each ignorant of insurance and business matters. What they were trying to do—What the policy of the Texas Motor Vehicle Safety Responsibility Law, Art. 6701h, Vernon's Texas Civil Statutes, encourages its citizens to do, is to procure liability insurance protecting them and members of the public for the operation of the 1950 Plymouth car in the affairs of mother and son. In that process, they were attempting fully to state all of the facts, furnish all of the information and answer all of the questions. If it was not adequate, or if not fully understood by Agent Hutson, or correctly reported by him to the company, it was not because of anything which these two inexperienced people consciously did.

Title to the 1950 Plymouth was in the name of both mother and son. It was the third of a succession of used Plymouths purchased since the boy's return from war and needed by him in his frequent trips to Veterans Hospitals for treatment. The first, a 1941 model, was paid for entirely by the mother. Traded in as a substantial payment for a second 1941 model, the balance on it was paid one-third by the mother and two-thirds by the son. With her consent, this was traded for the 1950 Plymouth. While the mother was liable as a co-signer on the Conditional Sales Contract, it was intended that Sherman would make all of the payments from his Government disability benefits.

Western's position, sustained below, was that while title was in (or partly in) Mrs. Jones, the car "really" belonged to the boy so that there was a breach of the representation [4] of ownership.

4. The face of the policy is described: "Declarations," Item 6 of which provides:
"Except with respect to bailment lease, conditional sale, mortgage or other encumbrance the named insured is the sole owner of the automobile, except as herein stated: * * * *no exceptions*".
Unlike the traditional fire insurance policy which makes the contract *void* if ownership in not absolute, see National Fire Insurance Co. v. Carter, Tex.Com. App., 257 S.W. 531; St. Paul Fire & Marine Insurance Co. v. Culwell, Tex. Com.App., 62 S.W.2d 100, Western's policy merely states:
"24. Declarations: By acceptance of this policy the named insured agrees that these statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

Since Western's attack is for a *misrepresentation* of a fact, not the absence of a contrary fact as a contractual condition, Article 21.16, Texas Insurance Code, V.A.T.S. (formerly Article 5043, R.S. 1925) applies:
"Any provision in any contract or policy of insurance issued or contracted for in this State which provides that the answers or statements made in the application for such contract or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case shall be a question of fact to be determined by the court or jury trying such case."

In the discussion with Agent Hutson, mother or son, or both, stated the facts about the title and the co-signed notes. The mother, apparently because another agent had declined to issue a policy for the stated reason that the boy was a minor, asked if the insurance couldn't be put in Sherman's name. Hutson replied that he could not issue a policy to a minor, so it would have to be in Mrs. Jones' name. While it was done in this fashion, Agent Hutson manifested his full understanding that Sherman was the one principally concerned as the premium for liability coverage, paid by Sherman's check for the precise amount (the mother paid for medical reimbursement coverage), was calculated under the Texas Manual Rate for drivers under age 25. And with the policy, he delivered to each of them in their respective names, an identification card showing that the 1950 Plymouth was issued by Western.

█ The Trial Court's findings of misrepresentation,[5] if a finding of fact as distinguished from the possible legal effect of conduct, lack requisite foundation and are thus clearly erroneous under Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A. The testimony of mother and son was clear that they gave Agent Hutson the full facts concerning the nature of Sherman's ownership and interest in the car.[6] Conceding that, as interested parties, the Court had wide latitude in rejecting it altogether, there is an entire want of evidence then to support the contrary fact—i.e., misrepresentation of sole ownership in the mother. This is so because Agent Hutson, as a witness, would neither admit nor deny that the Joneses had given the information testified to by them.[7]

█ On this analysis the findings, we think, were, in reality a conclusion that Western was deceived because what Hutson knew was not imputable to it. This rests, in turn, on the assumption that Agent Hutson had no authority whatever to write insurance to cover liabilities of a minor owner. But there is

5. Findings of Fact: "9. The policy of Western * * * was issued by Western in reliance upon the representation of Eunice V. Jones that she was the sole and unconditional owner of the Plymouth automobile covered thereby.

"10. The representation of Eunice V. Jones that she was the sole and unconditional owner of the Plymouth automobile covered by the policy was a false and material representation, but for which Western would not have issued the policy."

6. Western, whose whole neat structure rests on ownership by Sherman, proves this by conclusionary statements from these two lay persons, e. g.:
(By Mrs. Jones)
"Q. Now the title to that car was in your name, wasn't it, and Sherman's name? A. Yes, sir.
* * * * *
"Q. But the car actually belong to Sherman? A. Yes, sir.
"Q. Well, it was actually Sherman's car and you considered it that, didn't you? A. Yes, sir."
What was the standard of his? Legal ownership, expected principal use, or the loose, everyday use in family life where terms of possession, privilege of use, responsibility for upkeep, etc., have little conscious relation to legal title, e. g. (By Mrs. Jones):
"Q. It was his car and you have no interest in it whatsoever? A. Yah, I had an interest in it, yes, sir.
"Q. Well, I know, but it was his car, you recognized—you weren't claiming any interest in it; is that right? A. Well, in a way, yes, I was, because—
"Q. Well now, was it yours and Sherman's car or was it Sherman's car? A. Well, it was hissin mostly because he did all the driving, and I couldn't drive.
"Q. Well, it was actually Sherman's car and you considered it that, didn't you? A. Yes, sir."

7. Indeed, the Trial Court, finding collusion by the three, seems to have credited the testimony of mother and son that Hutson knew all they knew (Finding No. 3):
"* * * at that time [of issuance of policy] Eunice V. Jones, Sherman L. Jones and the agent Hutson each knew that Western would not issue a policy covering an automobile owned or partly owned by a minor, and the three of them were acting in Collusion to hold knowledge of such fact from the company and evade its rule against the issuance of a liability policy on an automobile owned by a minor."

no substantial foundation for this. By ingenious cross examination skillfully executed, mother and son, repeated extensively in the various shades presented by permissible leading questions, the idea that Hutson had told them he could not write a policy for minors and if he did, the company would send it back. The scope of agency can, however, hardly be established by such declarations of the agent, 2 Tex.Jur., Agency, § 125; Foote v. De Bogory, Tex.Civ.App., 179 S.W.2d 983, error refused, WM; McCormick on Evidence, § 244, p. 519 (1954).

Hutson's own testimony, had it stood alone, might possibly have permitted such a finding. But considered with the testimony offered by Western from a Special Agent having supervision over Hutson, it is clear that there was no prohibition making the issuance of a policy unauthorized, but that, at most, the company had certain underwriting policies and instructions[8] which the agents were to follow. But for manual laborers, truck drivers or insurance agents, failure to follow instructions in carrying out the principal's business entrusted to the agent, or mistakes made in an effort to apply them, is not equated with lack of authority, 2 C.J.S., Agency, § 95, p. 1203; Niagara Ins. Co. v. Lee, 73 Tex. 641, 11 S.W. 1024; Manhattan Life Ins. Co. v. Stubbs, Tex.Com.App., 234 S.W. 1099; Dewey T. Ross Engineering Corporation v. Sonneman, Tex.Civ.App., 159 S.W.2d 200; German Ins. Co. of Freeport, Ill. v. Gibbs, Wilson & Co., 42 Tex.Civ.App. 407, 92 S.W. 1068; Id., 42 Tex.Civ.App. 407, 96 S.W. 760, error refused.

Assuming that declarations made by Hutson would charge mother and son with knowledge that he could not issue a policy in the minor's name, there was yet no evidence that it was contrary to instructions to effectuate family coverage by issuance of the policy in the parent-owner's name. Indeed, by the issuance of the policy in that form, collection of the premiums, issuance of identification cards, Agent Hutson thought he was doing what he was permitted to do. If he thought so, surely the mother and son, untutored in business or insurance affairs, were entitled to believe as much.

Western knew what Hutson knew. Hutson knew what the situation was. Committed to his judgment and discretion under the wide authority reposing in him as Local Recording Agent, Art. 21.09, Texas Insurance Code, was the proper underwriting evaluation of this risk as it was known and presented to Hutson. If his judgment, either in writing it or in devising the form of the policy, was faulty, the remedy is not a *post* event cancellation of the policy for his acts were Western's acts. Traders & General Insurance Co. v. Lucas,[9] Tex.

8. E. g., minors owning automobiles were eligible for insurance: if married, if the company has coverage of other cars of the family or has other insurance business of the family. Additionally, since the only evidence of a prohibition was stated in terms of a single minor using the car away from home, a minor regularly making his place of residence at the home of his parents would likewise be eligible.

Sherman might have been eligible under two of these factors or at least Agent Hutson could have thought so.

In any case Western's effort to prove that the company would have rejected Sherman's application in his name showed quite plainly that the decisive factor to the Special Agent was Sherman's 100% disability rating—a matter wholly unrelated to the policy declarations which, with no warranty of physical fitness, committed this important element to the underwriting judgment and discretion of the Recording Agent Hutson.

9. An almost absolute parallel of the instant case, the opinion declines to follow Didlake v. Standard Insurance Co., supra, and cites with approval Blashfield's Cyclopedia of Automobile Law and Practice, Vol. 6, § 3629, 195 F.2d at page 251: "'Where an agent of the insurance company is aware of the fact that the insured is not the unconditional owner thereof, when he writes the policy upon the automobile, the insurer is charged with such knowledge and in consequence is deemed to waive the conditions in the policy with reference to the ownership of the automobile.'"

Civ.App., 281 S.W.2d 188, 192, error refused, NRE.

There was thus no fatal misrepresentation of ownership. At most, the words typed in the declaration by Agent Hutson were an incorrect description of the state of legal title—a thing immaterial, under these circumstances, to the attachment of the risk and in no way contributing to the contingency or event—the accident—on which the policy obligations became due. It was a binding contract, Kuntz v. Spence, Tex.Civ. App., 48 S.W.2d 413, reversed on other grounds, Tex.Com.App., 67 S.W.2d 254; Government Personnel Automobile Association v. Haag, Tex.Civ.App., 131 S. W.2d 978, error refused; and see, Mid-States Insurance Co. v. Brandon, 340 Ill. App. 470, 92 N.E.2d 540; Commonwealth Casualty Co. v. Arrigo, 160 Md. 595, 154 A. 136, 77 A.L.R. 1250; Churchman v. Ingram, La.App., 56 So.2d 297; Pauli v. St. Paul Mercury Indemnity Co., 167 Misc. 417, 4 N.Y.S.2d 41, affirmed 255 App.Div. 935, 8 N.Y.S.2d 691, application denied 280 N.Y. 853, 19 N.E.2d 685; Annotation, 33 A.L.R.2d 948.

The policy was validly issued, and if ownership is incorrectly described, it should be deemed reformed accordingly, Traders & General Insurance Co. v. Lucas, supra; Providence Washington Insurance Co. v. Rabinowitz, 5 Cir., 227 F.2d 300.

■ Once that is done, the 1951 Ford meets all of the requirements of a "newly acquired vehicle" under Clause IV, note 2, supra. Notice of its acquisition was given to Hutson within thirty days, and the transfer of the policy was actually made by Hutson, although in the mother's name to be consistent with the original issuance. The insurance automatically attaches on acquisition of a new vehicle subject only to being defeated by failure to give notice within thirty days. The intervention of the accident after acquisition but before reporting does not vitiate the insurance. See note 34 A.L.R. 2d at page 944. The clause is a sensible one to meet the definite needs of the automobile age in which vehicles are routinely and frequently traded for the newer, brighter, longer, lower models.

■ With Western's policy effective, it is conceded that it was available to Lola Jones Cutshall as an additional assured. This automatically brought into play the provision in General's policy (note 3, supra) which prescribed that the drive-other-car extension agreement V (note 3, supra) "shall be excess insurance over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with respect to said automobiles or otherwise." The effect of this is that Mrs. Cutshall did not have insurance with respect to other vehicles driven by her until she had reasonably exhausted coverage available to her elsewhere. And, when Western seeks to assert a contribution under the "Other Insurance" clause of its policy (identical with that of General's, see note 3, supra), it is met with the same proposition in different form since Mrs. Cutshall does not have "valid and collectible insurance against such loss." It is only when Western's policy has been exhausted that General becomes liable for the excess, and until that point is reached, Mrs. Cutshall, as named or additional assured, has no claim which she can assert. See Appleman, Insurance Law and Practice, Vol. 8, § 4914, p. 333, followed in Continental Casualty Co. v. Curtis Publishing Co., 3 Cir., 94 F.2d 710; Aetna Casualty & Surety Co. v. De Maison, D. C.E.D.Pa., 114 F.Supp. 106, reversed other grounds, 3 Cir., 213 F.2d 826; McFarland v. Chicago Exp., Inc., 7 Cir., 200 F.2d 5; and see, Continental Casualty Co. v. Suttenfield, 5 Cir., 236 F.2d 433, at page 438.

This leaves then only the contention by Western that Mrs. Jones voluntarily cancelled the policy June 4, 1953, and accepted a return of all premiums paid. It is sufficient here, we think, to say that, based as it was upon the express premise that there had been a misrepresentation as to ownership—a contention now held by us to be groundless—legal consideration is doubtful; and, in any

case, liabilities with respect to the accident of April 23 had already attached, especially since this was an effort to destroy, without her participation or consent, valuable rights which Mrs. Lola Jones Cutshall (and General claiming through her) then had for defense and indemnity. Of course, holding as we do that the policy was valid, the premiums must be restored under Mrs. Cutshall's tender to do equity.

The cause is therefore reversed and here rendered to declare that Western is liable to the full extent of the limits of its policy and General is liable only for the excess, if any.

Reversed and rendered.