537 F.2d 89
 Ahto WALTER, Plaintiff-Appellant,
v.
MARINE OFFICE OF AMERICA et al., Defendants-Appellees,
Firemen's Insurance Co., Defendant-Third Party-Plaintiff-Appellee,
Insurance Company of the State of Pennsylvania et al., Third
Party-Defendants-Appellees,
United States of America, Intervenor-Appellant.
 No. 73-3866.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 16, 1976.
 
 L. Glen Kratochvil, T. G. Schirmeyer, Houston, Tex., Harold B. Carter, Jr., John B. Gooch, Jr., New Orleans, La., for Walter.
 Gerald J. Gallinghouse, U. S. Atty., John R. Schupp, Asst. U. S. Atty., Chief, Civil Div., New Orleans, La., David V. Hutchinson, Trial Atty., Admiralty & Shipping Sect., Dept. of Justice, Wash., D. C., Leonard Schaitman, Thomas G. Wilson, Eloise E. Davies, Attys., Dept. of Justice, Civil Div., Washington, D. C., for U. S.
 George W. Healy, III, Thomas J. Wagner, New Orleans, La., for Ins. Co. of Pa., and others.
 Charles E. Lugenbuhl, William J. Larzelere, Jr., New Orleans, La., for Marine Office of Am. & Firemen's Ins. Co.
 Clarence A. Frost, New Orleans, La., for Underwriters of Lloyd.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, Chief Judge, COLEMAN and DYER, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 On April 5, 1967, Captain Ahto Walter (Owner), on the eve of seeing a lifetime dream come into being, witnessed, as an active participant, the capsizing of his incompleted, sophisticated factory processing fishing vessel MARY ANN as she was being oozed over the muddy bottom of Bayou Lafourche on her way to Bollinger shipyard for further outfitting preparatory to completion, later expected sea trials and ultimate acceptance. Now a decade later we must determine whether the District Court was correct in denying recovery to Owner as an additional assured against the shipyard's Builder's Risk insurer and on behalf of himself and the mortgagee against the two underwriters on the Builder's Risk policies issued to Owner. This result was reached on the decisive holding that there was no coverage for the casualty because MARY ANN had been "delivered" by Shipyard to Owner. We disagree and reverse.
 
 The Insurance Coverage
 
 2
 Walter (Owner) in 1965 contracted with the St. Charles Steel Works, Inc. (St. Charles) to have the shipyard supply materials and labor for the construction of a 110 foot fishing vessel designed by him and to be built under his direction and supervision for cost plus 10%. It was to be built at the St. Charles yard on Bayou Lafourche, at Thibodaux, Louisiana.
 
 
 3
 There are basically two coverages involved (although the second splits into two policies). At the outset St. Charles had a policy with Firemen's Insurance Company (Firemen's) a Builder's Risk policy which insured it "and/or any owner of the vessel as interest may appear" at the time of the loss in an amount ultimately increased to $200,000 (for which Owner paid the additional premiums). It was a time policy, but provided in the typed cover sheet[1] for termination on "delivery." There was no definition of that term. It provided broad and virtually "all risk" coverage, both generally[2] and specifically,[3] including sea trials[4] and to proceed to and from docks, wet or dry, harbors, etc.[5]
 
 
 4
 In 1966, prior to the completion of the vessel, but after it had been documented, Owner upon a promissory note borrowed $397,506[6] from the United States to finance construction. This note was secured by a preferred ship mortgage covering the MARY ANN, her engines, etc. As security for the payment of the promissory note, two mortgagee builder's risk insurance policies were obtained and paid for by him through Trans-Atlantic Marine, Inc. of Bridgewater, Mass. One was with Penn,[7] for $100,000,[8] the other with Lloyd's for $500,000,[9] so that Lloyd's had 5/6ths of the risk. These covered "any owner or owners of the vessel" with the United States as "sole payee," with a standard union mortgagee indorsement.
 
 
 5
 Penn prescribed calendar expiration dates or "until delivery if delivered at an earlier date," and then spelled out that "in no case shall this Policy extend beyond delivery of the Vessel." It insured the hull, fittings, materials, etc. "belonging to and destined for D/V MARY ANN building at the yard of the Builder at St. Charles Steel Works, New Orleans, Louisiana." In sweeping terms it provided "This policy insures against all risks of physical loss of or damage except as hereinafter provided." Although in different language, it provided substantially the same coverage as Firemen's with respect to movement to and from the location of the building site, sea trials, etc.[10]The Construction And Fitting Out Of MARY ANN
 
 
 6
 Walter, an experienced mariner, was himself to supervise and direct the work to be performed by employees of St. Charles. The ship was expected to have a draft of approximately 10 feet but Bayou Lafourche where the St. Charles yard was located was only about 9 feet deep with about 3 or 4 feet of soft silt through which a boat could slide. After MARY ANN's hull was launched, her superstructure was added while she was moored in a hole in the bank of the Bayou at the St. Charles yard, where she would not obstruct passage in the narrow Bayou. MARY ANN was not floating while she being outfitted, but was sitting on the bottom of the silt.
 
 
 7
 In December 1966, the vessel was inspected on the construction site by the United States Salvage Association, at the request of Penn, and recommendations were made to Owner looking toward a final inspection upon completion. The surveyors recommended that a stability test be made when all equipment was installed a condition which obviously called for her to be afloat.
 
 
 8
 By late March 1967 the vessel was complete except for connecting the propeller shaft to the main engine, testing and aligning the engine, and the pipes and pumps, and painting the hull with an anti-fouling paint.[11] The pumps could not be tested at St. Charles yard because mud would be sucked into the machinery and the main shaft and engine could not be connected and aligned because the ship was on the bottom. Accordingly, Walter undertook (with tugs and trucks furnished through St. Charles but not then under its direction) to have MARY ANN moved to a pier at Bollinger's shipyard, about 15 miles down the Bayou, where the water was deeper and all of the work, except the painting which required dry dock facilities, would be done by St. Charles workmen.[12] Walter had not made any arrangements for any work to be done at Bollinger's yard by Bollinger's employees.
 
 MARY ANN Takes A Bath
 
 9
 On April 5, 1967 tugs hired by Walter from Bourgeois arrived to move MARY ANN to Bollinger's yard. The ship had no propulsion system of her own because her engine was not connected to the shaft. However, all of the equipment to outfit the ship had been put aboard the vessel since she was not to return to St. Charles yard but would proceed from Bollinger's yard either to Avondale or Houma shipyards to be dry docked and have anti-fouling paint applied to her hull. Thereafter, Walter planned to proceed to the Mississippi River for a trial run.
 
 
 10
 The tugs pulled MARY ANN from the hole in the bank where she was berthed into the Bayou, where she may have floated briefly, but probably still dragging the bottom, she listed sharply to port then rolled on her port side and capsized. As a result much of her gear was lost overboard, and other equipment although salvaged was fouled with silt. This accident occurred about 100 yards from the St. Charles yard. Two marine surveyors were sent by the Marine Office of America to inspect the boat after she had capsized and to observe her righting and flotation. A few days later MARY ANN was successfully moved by aid of a barge and tugs to Bollinger's yard.
 
 The Repair And Completion Of MARY ANN
 
 11
 Eleven days after the casualty Bourgeois wrote Walter a letter asking him to come from Bollinger's to St. Charles yard to look over his final invoices for the construction of MARY ANN and notifying him that he was sending his brother and another St. Charles employee to line up the engines and test the pumps. The St. Charles employees' attempt to align the engine to the propeller shaft was unsuccessful due to damage from the capsizing but they were able to test the piping system. The damage which was caused by the capsizing was repaired by Owner at Bollinger's shipyard at a claimed expense of $76,550.59. A naval architect inspected the vessel and certified that it was completed on May 25, 1967,[13] whereupon Walter proceeded to Avondale Shipyard where the anti-fouling paint was applied to the ship's hull and subsequently in late May or early June a trial run on the Mississippi River was accomplished.
 
 
 12
 Claims were made by Owner and the United States under the insurance policies but neither the claim of Owner or the mortgagee has been paid.
 
 The Controlling Legal Regime
 
 13
 The Supreme Court in Wilburn Boat Company v. Fireman's Fund Insurance Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337, 1955 A.M.C. 46, reversing this Court, 5 Cir., 1953, 201 F.2d 833, 1953 A.M.C. 284, set out the now familiar principle applicable in the maritime insurance situations that, in the absence of federal legislation or a conflicting rule of law judicially established by the Federal Courts, state law would apply to the regulation of marine insurance matters. See also Irwin v. Eagle Star Insurance Co., 5 Cir., 1972, 455 F.2d 827, 829. With respect to the issues to be decided in this case there is no firmly established regime of federal law and consequently we find ourselves controlled by Louisiana law. However, there is more than a mere dutiful dependence upon Wilburn Boat which dictates the application of Louisiana law in this factual setting. Here, Louisiana has a substantial and a legitimate interest. Not only was the vessel being constructed in Louisiana by Louisiana shipbuilders but also the parties, with the exception of the United States, are either Louisiana residents or are corporations which do business in the state of Louisiana.[14] And there is the interesting factor that traditionally contracts for the construction of a ship are not ordinarily within the Article III maritime and admiralty jurisdiction.[15]
 
 Louisiana Insurance Principles
 
 14
 As a general principle of insurance law which is recognized in Louisiana[16] and elsewhere,[17] the insurance policy if uncertain in meaning should be construed against the insurer who wrote it and should be read liberally so as to indemnify the insured.[18] Thus, with the arguable doubts from some confusion in the policy as to whether it should terminate under the circumstances of this case, these doubts if possible should be resolved in favor of the insured.
 
 
 15
 Considering that a reviewing Court should view a contract in the light of the setting of the parties and their reasonable expectations as to risks and protection against them,[19] an insurance policy should be construed in such a way as to effectuate its purpose,[20] see 13 Appleman, Insurance Law and Practice, supra at § 7386. Here the clear purpose of the policy was to insure the thing until the work to be done by St. Charles was completed. There is no real doubt that, as contemplated, St. Charles was to test the pumps and align the engines. Indeed it recognized these obligations and undertook to perform them after the so-called "delivery." Since it must always have been known that the depth of water in the "hole" dredged out to accommodate the hull after her launching would be insufficient to permit alignment of shaft and engines, St. Charles was not finished with its tasks. It matters little, if at all, then, whose idea it was to move the vessel to a place where St. Charles could complete performance of its engagement.
 
 
 16
 The Trial Judge's holding strands on a bar of law and fact. Since the term "delivery" is not defined expressly or indirectly in any of the policies he reasoned that the usual principle of transfer of custody and control by one to another would apply.[21]
 
 
 17
 Here, on the uncontradicted facts there was no "sale" nor was it ever intended that there be. And more significant, St. Charles never had, nor was it ever intended that it have, custody and control. To be sure it was to be paid on a time and materials basis plus 10%. But at all times Owner was responsible for design and direct control and supervision over all that St. Charles was to, and would, do.
 
 
 18
 Nothing St. Charles did or did not do, or what the conversations were, leading up to Owner's decision to move MARY ANN at the time and way he did was a manifestation that St. Charles was abandoning the ship, the project or its commitments. Indeed, this dead reckoning analysis was soon verified by a positive fix when St. Charles, in keeping with its understood obligations, sent its men to test the pipes, pumps, etc., and to undertake to align shaft and engines.
 
 
 19
 Bearing on this, as well as coverage of the claim for an occurrence not on the site of the identified shipyard, it is plain from all the policies that the underwriters contemplated that during the continuance of coverage (prior to "delivery") the shipbuilder and the Owner-builder had risks physically removed from the precise situs of the shipyard facilities (see notes 3 and 4, supra ). The clear purpose to insure those risks if otherwise covered reflects the understanding that physical departure from the yard would not ordinarily constitute "delivery."
 
 
 20
 As a matter of law on the uncontradicted facts we hold that there was no "delivery."[22] Hence each of the policies was in full force and effect.
 
 Coverage For The Occurrence
 
 21
 As we hold the policies in effect, the question remains whether this casualty occurring away from the premises of St. Charles[23] is otherwise covered.
 
 Firemen's (Owner's) Policy
 
 22
 Firemen's policy expressly provides coverage as to all risks[24] "while in transit to and from the works and/or the vessel wherever she may be lying." Additionally it grants "leave to proceed to and from any wet or dry docks, harbours during the currency of this policy" (see note 5, supra ). Without throwing in for good measure the very broad liberty "to tow and be towed" borrowed from the Hull (times) form (see note 2, supra ) the policy, if not sufficiently precise to grant specific coverage is ambiguous as to what was meant and on the principles elucidated the policy must be construed in favor of the assured, the vessel owner.[25]
 
 Penn (Mortgagee Insurance)
 
 23
 With respect to Penn's basic liability it fares no better than Firemen's. Indeed, it is probably worse. It provides that the "policy insures only while the subject matter hereby insured[26] (is) in transit within the port of construction to and from such location ."
 
 
 24
 Clearly this movement was in the port of construction and was moving from, if not to, the location of this ill-defined yard.
 
 Lloyd's (Mortgagee Insurance)
 
 25
 Lloyd's presents only one difficulty. But it is a difficulty unknown to the appellate adversary structure. The difficulty with Lloyd's one which in the annals of contemporary Anglo-American advocative jurisprudence must be to this day the enigma wrapped in a mystery is why the Assured (Owner and Mortgagee) rejected the coverage which Lloyd's unconditionally offered and still does to them on a silver platter. After the case had been heard (April 1971) but before the decision of the District Court on September 27, 1973 Lloyd's, through new counsel, moved to be substituted, to withdraw previous answers denying liability filed on their behalf and to deposit a then specified sum in the registry for their portion of the loss. After an intuitive, uninformed, irrational, reflex opposition[27] by Owner and Mortgagee that showed little awareness of what was being offered the District Court denied the application. On a motion for rehearing, Lloyd's in the most positive terms acknowledged coverage and liability, reserving quite naturally only the questions of costs, attorneys' fees, interest and penalties. It was an unconditional confession of liability, with these limited reservations, for whatever sums the Court determined the Assureds had sustained.
 
 
 26
 As is elucidated in the factually unopposed motion and memorandum in support of this motion, Lloyd's policy was issued on the British form termed the "Institute Builder's Risk Clauses," while the Penn policy was written on the "American Institute Builder's Risk Form." The essential difference between these forms is that under the express provisions of the Lloyd's policy the vessel could be moved upon payment of an additional premium for the tow (subject to later reporting), while under the Penn policy Penn asserted the vessel was covered only while on the premises declared in the policy, the St. Charles shipyard. According to the uncontradicted affidavit of Lloyd's substituted counsel, there was a permissible subsequent request made through Trans-Atlantic Marine, for coverage of the towing operation on October 5, 1967 and on October 24, 1967 Lloyd's advised Trans-Atlantic Marine that the tow of MARY ANN would be covered upon payment of an additional premium.
 
 
 27
 Lloyd's confessed its liability by motion and supporting papers filed on October 4, 1972. The correspondence attached to the papers effectuating confession of liability were revealing. In the course of Lloyd's trying to find out the basis of the claim and after having advised Trans-America that, for this casualty at least, Lloyd's had issued the coverage ($500,000) on the British form more favorable to the Assured, Lloyd's rejected Trans-America's suggestion to the detriment of the interests of its Assureds (Owner and Mortgagee) that the previous cover note be surrendered so that a new one could be substituted on the less advantageous American (Penn) form. The British underwriters, to their credit, rejected this duplicitous suggestion. With this development, they asserted that Trans-America had no power to retain the distinguished counsel[28] acting for both Penn and Lloyd's or give them instructions to deny a liability which they now readily confessed.
 
 
 28
 On the basis of this confession of liability by Lloyd's, these underwriters are cast for 5/6ths of the loss.[29]
 
 Mortgagee Recovers Despite Repairs
 
 29
 As discussed earlier, Owner paid for all of the repairs and either paid or incurred the cost of all the salvage efforts. For the purposes of this case MARY ANN was completely restored to her former condition. In a physical-operational sense, therefore, the Mortgagee had not, did not, would not suffer any diminution of its security. The question arises then whether, under the standard union mortgage clause with loss payable solely to Mortgagee, underwriters (Penn and Lloyd's) are liable to Mortgagee for the dollar amount of the loss sustained by Owner. The answer is yes.
 
 
 30
 This is controlled by Louisiana law. Although the Erie beacon may be a little dim, it is sufficiently bright for us to conclude that Louisiana follows, and would do so here, the generally accepted rule.
 
 
 31
 The leading case is Savarese v. Ohio Farmers' Insurance Company, 1932, 260 N.Y. 45, 182 N.E. 665. There the issue was whether repair of the premises by the mortgagor after a fire prevented a mortgagee from recovering the insurance under the mortgage clause. The New York Court of Appeals held that the act of the owner in making repairs was not in behalf of the insurance company or as its agent, and accordingly did not affect the duty of the insurance company to make payment under the mortgagee insurance.[30]
 
 
 32
 The opinion is an excellent analysis of why the result which, as the Court put it, at first blush seems wrong is correct. The mortgagee insurance is for these purposes an independent contract between insurer and mortgagee. The loss, if covered by the terms of the policy, becomes due on the happening of the event whether in fact the mortgagee has or will suffer an ultimate loss of security. The insurer cannot, in effect, demand that its Assured, the Mortgagee, first exhaust remaining security before claiming on the policy. Nor must the Mortgagee wait until it is determined whether or to what extent the mortgagor plans to or will restore the property.
 
 
 33
 This is the view of recognized insurance commentators[31] as well as those on mortgages.[32]
 
 
 34
 Louisiana courts share these views that the mortgagee under a mortgagee payee clause acquires a right to the insurance proceeds even though he suffers no actual loss, as when the vessel in this case was restored to its former condition by the mortgagor. In the analogous case of Joshlin v. Home Security Mortgage Corp., La.App., 1965, 178 So.2d 784, it was held that a repairman could not recover the proceeds of a mortgagee insurance policy over the objection of a mortgagee insured under a loss payable clause similar to the one at issue in this case. Similarly, in Durbin v. Allstate Insurance Co., La.App., 1972, 267 So.2d 779, application not considered, 263 La. 621, 268 So.2d 678, it was held that a mortgagee is entitled to the proceeds of a mortgagee policy to the extent of his mortgage debt and no mention was made by the Court that repair could partially or wholly diminish the amount of this recovery.[33]
 
 
 35
 Another case which provides guidance is Diaz v. Cherokee Insurance Co., La.App., 1973, 275 So.2d 922 at 925 where the Court held that when a mortgagee is designated as the loss payee, the insured in effect appoints him to receive payment under the policy.[34] Upon this same reasoning, the Court in Wray-Dickinson Company v. Commercial Credit Co., La.App., 1939, 192 So. 769, held that under an automobile collision policy with mortgagee an assured, the mortgagor's assignment to the suing repairman of the mortgagee insurance proceeds was ineffective since the owner of the automobile had nothing to assign. The mortgagee's rights vested at the time of the accident[35] and the subsequent decision to repair by the owner could not divest the mortgagee of his right to recover under the policy.[36]
 
 
 36
 The upshot is that the United States as mortgagee recovers judgment against Penn and Lloyd's for their respective proportions of the loss sustained, incurred or expended by Owner.[37] Considering that this mortgagee insurance is separate from that which simultaneously covers the Owner in the two policies, United States v. Fishing Vessel MARY ANN,[38] 5 Cir., 1972,466 F.2d 63, at 64, cert. denied, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590; Levine v. Insurance Co. of North America, 5 Cir., 1971, 440 F.2d 679, this result does not amount to a windfall to the Government. This is so because the amounts recovered by the Government must be applied on the mortgage debt (or the deficiency). The general principle has been well stated by the Missouri Court of Appeals:
 
 
 37
 "It has been held in this state that, if a mortgagee, under an arrangement with a mortgagor, insures the mortgaged property at the charge of the mortgagor, the insurance money will be paid in the event of loss to the mortgagee, extinguishing pro tanto the debt of the mortgagor to the mortgagee. McDowell v. Morath, 64 Mo.App. 290, 298."
 
 
 38
 Hartford Fire Insurance Co. v. Bleedorn, 1939, 235 Mo.App. 286, 132 S.W.2d 1066, 1070. Louisiana is in accord with this general principle:
 
 
 39
 "It is well established as the law of Louisiana that where insurance is taken out by the mortgagor for the benefit of mortgagee, or is made payable to the mortgagee as his interest may appear, the mortgagee is entitled to the proceeds of the policy to the extent of his mortgage debt, holding the surplus, if any, after the extinguishment of his debt for the benefit of the mortgagor. Adams v. Allen, La.App., 19 So.2d 578 (1st Cir. 1944)."
 
 
 40
 Durbin v. Allstate Insurance Co., La.App., 1972, 267 So.2d 779, 781. And it is recognized elsewhere:
 
 
 41
 "When we further analyze the terms of the policy and the situation of the mortgagee, reason also points to the conclusion that when a fire occurs the insurance company must pay the loss to the mortgagee in accordance with its contract with him. The mortgagor benefits by such payment as the insurance money reduces the amount of the mortgage debt. Waring v. Loder, 53 N.Y. 581. The value taken out of the property by the fire is taken off the mortgage by the payment of the insurance money, and the parties remain in the same relative position after as before the fire."
 
 
 42
 Savarese v. Ohio Farmers' Insurance Co., supra, 182 N.E. at 667.Remand
 
 
 43
 As the Court naturally did not get to ascertaining the full recoverable loss this is open on remand.[39] See note 37, supra. Likewise the Court must initially determine the amount and recovery, if any, for interest, penalties and attorneys' fees.[40]
 
 
 44
 REVERSED and REMANDED.
 
 
 
 [1]
 The typed form provided:
 "2. This insurance is to cover in respect of (vessels) constructed by (St. Charles) at (St. Charles Works) and is to continue until delivery of the vessel at the Assured's yard, . . . Raceland Louisiana."
 
 
 [2]
 The boilerplate printed form (50,1959) used the quaint language of the Hull policy (see Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., 5 Cir., 1957, 247 F.2d 116, 1957 A.M.C. 1946, cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260; Saskatchewan Government Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 1957 A.M.C. 655) against losses by rovers, pirates, letters of mart, detainments by kings, princes and peoples, but providing in contemporary language "With leave to sail with or without pilots, to tow and be towed. . . ."
 
 
 [3]
 "This Insurance is also to cover all risks, including fire, while under construction and/or fitting out, including materials in Buildings, Workshops, yards and docks of the assured, or on quays, pontoons, craft, & c., and all risk while in transit to and from the works and/or the vessel wherever she may be lying, also all risks of loss or damage through collapse of supports or ways from any cause whatever, and all risks of launching and breakage of the ways." (Emphasis supplied)
 
 
 [4]
 "This Insurance is also to cover all risks of trial trips, loaded or otherwise, as often as required, and all risks whilst proceeding to and returning from the trial course but warranted that all trials shall be carried out within a distance by water of 100 nautical miles of the place of construction or held covered at a rate to be arranged."
 
 
 [5]
 "With leave to proceed to and from any wet or dry docks, harbours, ways, cradles, and pontoons during the currency of this policy."
 
 
 [6]
 The amount loaned was later increased to $417,847.11 See Exhibit NN, No. 4
 
 
 [7]
 The Insurance Company of the State of Pennsylvania, policy No. HEE-1248 on American Institute Builder's Risk Form (Dec. 1, 1959)
 
 
 [8]
 See note 7, supra
 
 
 [9]
 Until later events (see note 27, infra ) this was evidenced by Trans-America's Cover Note No. 6182. It stated:
 "To follow Policy HEE 1248 on behalf of (Penn)" and under "Terms and Conditions: Institute Builder's Risk Clauses (schedule deleted)."
 
 
 [10]
 "This Policy insures only, during the period aforesaid, while the subject matter hereby insured is at (ashore or afloat) the building location hereinbefore named; while in transit within the port of construction to and from such location ; while on trial trips (including proceeding to and returning from the trial course) loaded or otherwise, as often as required, within a distance by water of 100 nautical miles of the port of construction or held covered as hereinafter provided." (Emphasis supplied)
 
 
 [11]
 A report of the Government Regional Loan Administrator indicated that the vessel was 90% completed on March 27, 1967, nine days before the mishap occurred. The report also indicated that a marine architect had been hired to furnish the Government with a statement regarding completion prior to the final disbursement. See Exhibit NN, No. 4
 
 
 [12]
 There was a conflict of testimony as to who desired to have the boat removed to the Bollinger yard. Walter testified that the removal was at Bourgeois' suggestion, (R. at 641, 861), but Bourgeois testified that it was Walter's idea to take the boat to a larger yard so that it could be finished more quickly. (R. at 153). The District Court did not think it necessary to resolve this much mooted dispute. It cuts no figure in our analysis. In any event, Bourgeois admitted that he agreed to, and did, do work at Bourgeois' yard required for completion of the vessel. (R. at 1263, 1264, 1269-70, 1276)
 
 
 [13]
 See Exhibit NN, Report of Survey by Arthur A. Grant
 
 
 [14]
 In Irwin v. Eagle Star Ins. Co., supra at 830, we took a similar approach in determining whether it would be appropriate to allow state law to be controlling when the issues involve marine insurance matters
 
 
 [15]
 See Calbeck v. Travelers Ins. Co., 1962, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368, 1962 A.M.C. 1413, reversing Travelers Ins. Co. v. Calbeck, 5 Cir., 1962, 293 F.2d 52
 
 
 [16]
 It is firmly established under Louisiana law that the insurance policy should be construed in favor of the insured and, when possible, should seek to indemnify him. See, e. g., Aptaker v. Centennial Ins. Co. of New York, La.App., 1967, 198 So.2d 188 (property insurance); Simmons v. American Nat'l Ins. Co., La.App., 1967, 199 So.2d 421 (health insurance); Guillory v. Grain Dealers Mut. Ins. Co., La.App., 1967, 203 So.2d 762, application denied, 205 So.2d 605, 251 La., 687 (automobile insurance); Conner v. Motors Ins. Corp., La.App., 1968, 216 So.2d 555 (automobile insurance); J. M. Brown Constr. v. D & M Mechanical Contractors, Inc., La.App., 1969, 222 So.2d 93 (professional liability insurance); Francis v. Universal Life Ins. Co., La.App., 1969, 223 So.2d 188, application denied, 254 La. 781, 226 So.2d 771 (life insurance); Blanchard v. Hanover Ins. Co., La.App., 1971, 250 So.2d 484 (automobile insurance); Fuselier v. Louisiana Hosp. Serv., Inc., La.App., 1972; 260 So.2d 32 (health insurance)
 
 
 [17]
 This basic precept of insurance policy interpretation is well established in American jurisprudence. See 13 Appleman § 7401 at 50 (1943); more specifically, builder's risk policies have consistently been interpreted liberally so as to indemnify the insured. Id. at § 7463
 
 
 [18]
 See 11 Couch on Insurance 2d § 42:429 (2d ed. 1971)
 
 
 [19]
 See, e. g., Motor Vehicle Cas. Co. v. Atlantic Nat'l Ins. Co., 5 Cir., 1967, 374 F.2d 601; Am. Agricultural Chem. Co. v. Tampa Armature Works, Inc. & Am. Agricultural Chem. Co. v. Nye, 5 Cir., 1963, 315 F.2d 856 (Brown, C. J., concurring); Indem. Ins. Co. of N. Am. v. DuPont Air Interests, 5 Cir., 1961, 292 F.2d 569; United States Indus., Inc. v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292, n. 14; Fidelity-Phenix Fire Ins. Co. v. Farm Air Serv., Inc., 5 Cir., 1958, 255 F.2d 658; Am. Fidelity & Cas. Co. v. St. Paul-Mercury Indem. Co., 5 Cir., 1957, 248 F.2d 509
 
 
 [20]
 See Tyler v. Touro Infirmary, 1969, 254 La. 204, 223 So.2d 148
 
 
 [21]
 The Court stated:
 "In common usage, 'delivery' may be defined as the transferring or giving up or over by one to another of the actual or constructive possession or control of an object or thing."
 To this he appended note 6 citing the codal provision of Art. 2477 which with its quaint prefatory language speaks of "transferring . . . the thing sold into the power and possession of the buyer" (emphasis added).
 
 
 [22]
 We arrive at this independent of the principles (see notes 16-18, supra ) construing ambiguous policies in favor of the assured. But whatever weakness inheres in our approach quickly vanishes in the light of those principles, for the undefined term "delivery" can mean all things to all people "people" including shipyards, vessel owners, owner-builders and underwriters
 
 
 [23]
 Oddly enough Penn's policy refers to "the yard of the Builder at St. Charles Steel Works, New Orleans, Louisiana" although the yard is near Thibodaux on Bayou Lafourche some 40 miles southwest of New Orleans and the substantive coverage (see note 10, supra ) initially limits application to "the building location hereinbefore named ."
 
 
 [24]
 The boilerplate attachment describes the coverage as "On Hull, Tackle, . . . Engines, Machinery, . . . Boats and other Furniture and Fixtures and all material belonging to and destined for" the vessel's insured
 
 
 [25]
 Owner asserts that this probably comes as no surprise to Firemen's since the record indicates, so he asserts, from its own actions, etc., that it was on the verge of paying the claim until it learned that there were other underwriters in the picture (mortgagee insurance) from which it might hopefully recapture half a loaf if not the whole. See, e. g., Am. Fidelity & Cas. Co. v. St. Paul Mercury Indem. Co., 5 Cir., 1957, 248 F.2d 509; United Services Auto. Ass'n v. Russom, 5 Cir., 1957, 241 F.2d 296; Gen. Ins. Co. of Am. v. Western Fire & Cas. Co., 5 Cir., 1957, 241 F.2d 289; Maryland Cas. Co. v. S. Farm Bureau Cas. Ins. Co., 5 Cir., 1956, 235 F.2d 679
 
 
 [26]
 The first cover sheet uses the boilerplate of Firemen's (note 24, supra )
 
 
 [27]
 For a barely plausible reason this reflex opposition centered on the fact that the Lloyd's formal policy (Lloyd's London and/or Institute of London Companies, policy No. 655/MA. 41542(A)), dated Feb. 13, 1967 (issued formally to effectuate Trans-America's cover note (see note 1, supra )) was a new number not previously disclosed. Overlooked entirely was the British underwriters' recognition of unquestioned liability and their present willingness to accept their 5/6ths responsibility
 
 
 [28]
 There is no intimation that these counsel (now still acting for Penn after an agreed substitution for new counsel for Lloyd's) were privy to any of these facts. The same, however, cannot be said of Trans-America whose correspondence makes their actions and motives plain
 
 
 [29]
 After answer initially filed and the express confession of liability (as well as counterclaims by Lloyd's against others), it is of no moment that Owner did not formally amend, as did Mortgagee, his complaint to list Lloyd's as a defendant. See, e. g., F.R.Civ.P. 15(a) & 15(b)
 
 
 [30]
 See also Alexandra Restaurant, Inc. v. New Hampshire Ins. Co. of Manchester, Sup.Ct., App.Div., 1947, 272 App.Div. 346, 71 N.Y.S.2d 515; Hartford Fire Ins. Co. v. Bleedorn, 1939, 235 Mo.App. 286, 132 S.W.2d 1066
 
 
 [31]
 Authoritative sources on insurance have unequivocally stated this principle as follows:
 RIGHT OF MORTGAGEE NOT DEPENDENT UPON LOSS.
 A standard clause payable as interest appears makes the loss payee an insured.
 The right of a mortgagee under a standard mortgage clause is not dependent upon his sustaining loss. That is, the mortgagee under such a clause acquires a right to the insurance proceeds even though he suffers no actual loss, as when the building was restored to its former condition by the mortgagor (citing Savarese ).
 
 
 [11]
 Couch on Insurance 2d § 42:696 (2d ed. 1971). See also Appleman, Insurance Law and Practice, § 3407 (1943)
 
 
 [32]
 See 1 Glenn on Mortgages § 27.4 at 181-82 (1943); 3 Powell on Real Property, P 460 at 674-75 (1974)
 
 
 [33]
 The Court stated that:
 It is well established as the law of Louisiana that where insurance is taken out by the mortgagor for the benefit of mortgagee, or is made payable to the mortgagee as his interest may appear, the mortgagee is entitled to the proceeds of the policy to the extent of his mortgage debt, holding the surplus, if any, after the extinguishment of his debt for the benefit of the mortgagor. Adams v. Allen, La.App., 19 So.2d 578 (1st Cir. 1944).
 
 
 [34]
 Support of this concept is found in Officer v. Am. Eagle Fire Ins. Co., 1932, 175 La. 581, 143 So. 500, as well as 5A Appleman, Insurance Law and Practice, § 3335 at 143
 
 
 [35]
 In Pearson v. Rapstine, 5 Cir., 1953, 203 F.2d 313, 315, we held that the rights of a mortgagee under a mortgagee insurance policy become fixed and determinable at the time of the casualty
 
 
 [36]
 Perhaps the first case to establish the principle that the mortgagee's rights vested at the time of the accident was Savarese v. Ohio Farmers' Ins. Co., supra, 260 N.Y. at 54, 182 N.E. at 667
 
 
 [37]
 As the amount of the losses was hotly contested but not reached by the District Court, this is open on remand. The mortgagee's dollar award will follow that fixed by the Court for Owner against Firemen's
 
 
 [38]
 Walter's enterprise apparently failed, he defaulted on the mortgage, the Government foreclosed in the Southern District of Texas and obtained a deficiency judgment of $209,527.14 in United States v. Fishing Vessel MARY ANN, S.D.Tex., 1971, 330 F.Supp. 1102, affirmed in 466 F.2d 63 (5 Cir., 1972)
 Subsequently in the instant case in the Eastern District of Louisiana the Government filed a lien against Walter's ultimate recovery from any one or more of the insurers here sued.
 
 
 [39]
 Firemen's cross complaint against Penn and Lloyd's, and Penn and Lloyd's cross complaint against Walter were dismissed by the Court. No appeals were taken from these actions. These decisions are final
 To the extent still pending or not acted on, Lloyd's cross complaint against Ernest Enos, Enos Insurance Agency and/or Trans-American Marine is open.
 
 
 [40]
 The position of Lloyd's is quite different from Firemen's and Penn. The Trial Court must determine in point of time and dollars the effect of Lloyd's unqualified confession of liability