150 So.2d 75 (1963)
Mrs. Jeanne LABICHE, Widow of Thomas REAGAN, Jr., as Natural Tutrix of Thomas N. Reagan
v.
MID-CONTINENT UNDERWRITERS, INC., et al.
No. 919.
Court of Appeal of Louisiana, Fourth Circuit.
February 4, 1963.
Rehearing Denied March 4, 1963.
Certiorari Refused April 17, 1963.
*76 Lemle & Kelleher, Harry B. Kelleher, Murphy Moss, New Orleans, for plaintiff and appellee.
William A. Porteous, Jr., New Orleans, and William Garth Symmers, New York City, for defendants and appellants.
Before McBRIDE, CHASEZ and HALL, JJ.
McBRIDE, Judge.
Thomas Reagan, Jr., was the holder of and assured under two separate certificates or policies of insurance, each in the principal sum of $100,000, which insured his life against the risk of death caused by accident "solely and independently of any other cause," and specifically excluded death "directly or indirectly caused or contributed *77 to by * * * disease or natural causes." The assured's teenaged son, Thomas N. Reagan, was named in each policy as the beneficiary. The question to be determined in this case is whether the death of the assured, which occurred under very unusual circumstances at his home 46 Lark Street, New Orleans, was accidental "solely and independently of any other cause."
Thomas Reagan, Jr., the assured, died suddenly December 19, 1960, and his surviving widow, Mrs. Jeanne Labiche Reagan, as natural tutrix of the minor beneficiary, brings this suit in the minor's behalf against the defendants to recover the face value of each of said certificates or policies on the allegation that the assured's death was caused solely by accident and that the defendant insurers are liable under their respective certificates or policies.
The insurers defend the action denying liability on the ground that the death was directly or indirectly caused or contributed to by intentional self-injury, disease, or natural causes, and thus it was an occurrence expressly excluded from coverage; that the beneficiary failed to notify defendants or their representatives of any accident to the assured as soon as reasonably practical after the occurrence of the event; that the underwriters, Swett & Crawford, were not given immediate notice of the death in writing as is required by the certificates or policies; that a surgical examination and autopsy of the corpse of the assured was made by a private physician-pathologist at the instance of the assured's representatives without due notice having been given to the underwriters or their representatives so as to enable the underwriters to have their medical officers present at the same time, which notice should have been given under the terms of the certificates or policies.
After a trial on the merits of the case, which consumed four full days, judgment was rendered in favor of plaintiff as prayed against each defendant for its respective share of liability under the certificates or policies. All defendants have appealed.
At the time of his death Thomas Reagan, Jr., was 58 years of age and a salesman-proprietor of several companies in Louisiana. The last person to see him alive was his wife. While not a person in the best of health, he was apparently in a good physical shape. A short time before 8 o'clock on the morning of Monday, December 19, 1960, after he had arisen and partaken of coffee, he entered the bathroom on the first floor of his home in order to take a shower in the bathtub. Shortly thereafter, possibly 25 minutes, Reagan's wife opened the shower door on the bathtub and discovered him lying in the tub. Water was still flowing from the showerhead and Reagan's head or hand was resting over the drain and there was water in the tub. Mrs. Reagan, after cutting off the water, ran outside calling for help. Getting no response, she telephoned Mr. Lionel Favret, a neighbor, who responded to the call by rushing to the Reagan home where he observed the body of the assured, apparently lifeless, with the upper part of his body a deep purplish-blue (cyanosis), lying in the tub stomach down, legs bent at the knees toward the wall side of the tub. It might be mentioned that the assured was a large man, about 6 feet tall, weighing about 210 pounds. Mr. Favret and Mrs. Reagan experienced difficulty in removing the body from the tub. To accomplish this feat, it was necessary to rip out one of the sliding shower doors and then pull the body up and roll it over the side of the tub into Mr. Favret's lap and then to the floor. Mr. Favret then commenced vigorous artificial respiration by rib-cage pressure for about 15 minutes until the police arrived. There was no sign of life.
Dr. Nicholas Chetta, the Coroner of the Parish of Orleans, lived next door to the Reagan home, and soon after the discovery of the body, Mrs. Chetta was notified thereof, Dr. Chetta at the time being on the way to his office. Mrs. Chetta contacted *78 the coroner just as he was arriving at his office and informed him that Reagan had suffered a "heart attack." Dr. Chetta dispatched two police crash truck officers and a crash truck to the Reagan home, and when the coroner reached there, these officers had begun their efforts to administer oxygen with a resuscitator. Dr. Chetta noted that the resuscitator mechanism was popping, which was an indication to him that no oxygen was getting through Reagan's windpipe to the lungs. We are told that such a condition frequently occurs in persons who have died because of heart attacks or from being asphyxiated, and Dr. Chetta's initial belief was that Reagan had died of a heart attack.
Within the hour after Reagan's death the plaintiff telephoned the family lawyer, who had a general familiarity with the assured's affairs and knew that the assured had a number of life insurance policies, some of which provided for double indemnity in case of accidental death, but the attorney seems not to have been aware at the time of the existence of the two accident policies which are the predicate of this suit. The attorney contacted by telephone Dr. Charles Dunlap, a pathologist of the Tulane Medical School, but he did not advise any representative of the insurers that he was doing or had done this. He employed Dr. Dunlap and instructed him to go to the morgue and attend the autopsy which was scheduled to be performed that morning by the coroner and his pathologist, Dr. Monroe S. Samuels. Upon Dr. Dunlap's arrival at the morgue, he learned that the coroner's autopsy had been completed and that Reagan's body had been transported to a funeral parlor for embalming and burial. Dr. Dunlap notified the attorney of this and following the attorney's instructions, he proceeded to the funeral parlor where the body had already been sewn up. He then reopened various parts of the anatomy, examined some organs, and took one piece of the prostate gland and made sections thereof for microscopic study. He took no other tissues. At the time Dr. Dunlap found nothing which was indicative that death was caused or contributed to by accident. However, he appears to have continued an active interest in the case and thereafter consulted, from time to time, with the coroner.
Plaintiff for some years had been a chronic alcoholic and the official autopsy revealed a number of abnormal conditions. The examination of the larynx showed an antemortem condition characterized by inflammatory cells or laryngeal edema and Dr. Milton Helpern, a physician from New York, called as an expert witness on behalf of the defendants, stated that this condition was sufficient to close off the air passages and cause death. According to Dr. Helpern, laryngeal edema is a swelling of the mucous membrane, the lining of the larynx and also the tissues which constitute the bands which are called the vocal cords. There was no evidence or indication of trauma to the larynx.
As a result of the autopsy performed by Dr. Samuels in the presence of Dr. Chetta on the day Reagan came to his death, the following "Final Diagnoses" were listed as conditions found in the deceased's body:
1. Laryngeal edema.
2. Fibrous myocardial scar at apex of left ventricle.
3. Fatty liver.
4. Chronic cholecystitis and cholelithiasis.
5. Congenital absence of left kidney.
6. Diverticuli of colon.
7. Fibrous adhesions over left lung.
Some days later, following preparation and examination of microscopic slides of random sections of lung tissue, the following was added:
8. Bone marrow and fat embolism to lungs.
*79 The conditions numbered 4, 5, 6 and 7 may be disregarded as they are of no relevancy and shed no light on the cause of death. The conditions numbered 1, 2, 3 and 8 are respectively either recognized by some of the experts as causes of sudden death or explanations for otherwise unexplained sudden deaths. Before delving into an analysis and evaluation of the conflicting medical testimony before the court as to what the experts thought caused Reagan's death, we think it proper to pass on the other defenses raised by the defendants, i. e., whether proper notice of the accident had been given as provided in the certificates or policies and whether the insurers are absolved from liability because the surgical examinations or autopsies of the body of the assured were made without notice having been given to the underwriters so as to enable them to have medical experts present at the time.
The insuring certificates or policies provide under Paragraph "I," Subdivision 1, as follows:
"In the event of death immediate notice must be sent to Underwriters or Sweet & Crawford."
Of course, the above being a condition of the certificates or policies and a prerequisite to recovery thereunder, it was encumbent upon the plaintiff to establish that said provision was reasonably complied with by him, or that the defendants otherwise had sufficient notice of the occurrence, or that under the circumstances formal notice was unnecessary.
First, let us say that in Louisiana the word "immediate," when used respecting notices required by the conditions of insurance policies, means notice within a reasonable time or without unnecessary delay and admits of a reasonable excuse for some delay. LSA-R.S. 22:213(A) (3); Jackson v. State Farm Mut. Automobile Ins. Co., 211 La. 19, 29 So.2d 177; Jones v. Shehee-Ford Wagon & Harness Co., Inc., 183 La. 293, 163 So. 129; Konrad v. Union Casualty & Surety Co. of St. Louis, Mo., 49 La.Ann. 636, 21 So. 721; Smooth v. Metropolitan Life Ins. Co., La.App., 157 So. 298. Notice of death need not include notice of the cause of death. Konrad v. Union Casualty & Surety Co. of St. Louis, Mo., supra.
The contractual provisions before us that in the event of death immediate notice must be given to the Underwriters only contemplates a notice in the event the death has been accidental for which a claim to the insurance proceeds can be made.
The fact that Reagan's death might be accidental was not brought home to plaintiff and the minor beneficiary until some 24 days after it occurred. The attorney of the beneficiary first saw the accident certificates or policies on December 22, 1960, the day following the interment.
But, be that as it may, the evidence is clear that the insurers had knowledge of Reagan's death. On the morning of December 20, 1960, the day after the death occurred and prior to the interment, Roy DeSonier, of Levert & DeSonier Insurance Agency, whose stamp appears on both certificates or policies, was apprised of the death by the attorney. It was then that the attorney first learned of the existence of the accident certificates or policies and he informed DeSonier that an autopsy had been ordered by the coroner and that time would be required before its results were known. DeSonier, it seems, had already heard of Reagan's death. Moreover, on the afternoon of December 20, 1960, the attorney and DeSonier had further discussions about the unusual circumstances of the death. Fred L. Kriedt, President of defendant Mid-Continent Underwriters, Inc., who signed the certificates or policies of insurance, admitted that he had learned of Reagan's death on December 20, 1960, through an article published in the Times-Picayune, a daily newspaper of wide circulation published in New Orleans. Furthermore, on the same day DeSonier told *80 Kriedt there were rumors that an accidental death claim would be filed under the policies, but Kriedt, thinking this was unworthy of being reported to his underwriters, did nothing. Some days after December 20, 1960, Kriedt heard further rumors of a claim and as a result cabled his underwriters about the death and the claim on December 31, 1960.
It was not until about January 13, 1961, that the coroner in his protocol certified that the death was "accidental." On January 19, 1961, plaintiff's attorney requested DeSonier to furnish the necessary proof of claim forms, but no such forms were ever received although DeSonier had passed this request on to Kriedt. On January 21, 1961, Kriedt employed an investigator in connection with plaintiff's claim, and on January 23, 1961, one of defendants' counsel asked that he be furnished with copies of any communications relating to the plaintiff's claim since he had been retained in opposition to it. On or about February 3, 1961, formal claim was made by plaintiff for the insurance proceeds in the form of letters by certified mail to Mid-Continent Underwriters, Inc., on February 3, 1961, and to Swett & Crawford on February 7, 1961. Reagan's death certificate and the coroner's protocol concerning the cause of death were annexed to the letters.
We think that defendants had sufficient notice of the death of the assured and that when it became known that the beneficiary had a claim to the insurance proceeds because of an accident, the notice given insurers was adequate, reasonable and all that was necessary. Certainly the defendants have not shown that any of their rights were adversely affected because of the manner in which the notice was given or received or by the lapse of the time between the death and the giving of formal notice of the claim. All defendants rely on is the bald provision of the contracts that they were entitled to "immediate notice," which they contend was not forthcoming, and we do not believe that the law will allow them to escape liability even if it can be said that the notice did not rigidly conform to the requirements of the policy in the absence of a showing by them that their positions were jeopardized.
The insuring certificates or policies further provide in Paragraph "I," Subdivision 1, that:
"* * * no surgical examination of the body of the Assured shall be made at the instance of his representative without due notice having been first given to Underwriters, so as to enable Underwriters to have their medical officers present at the same time."
The autopsy performed by the coroner was his official act and was not made at the instance of any representative of the assured. LSA-R.S. 33:1561 provides that the coroner shall hold an inquest or make an investigation in all cases of sudden death, death due to unknown causes, death without attending physician or other remedial treatments, or death in which there is a suspicion as to the cause, and he has the right to order autopsies in any cases, all within his discretion. No representative of the assured directed the coroner to make an autopsy or had any control over the coroner's surgical examination of the corpse. In International Travelers' Ass'n v. Melaun (Tex.Civ.App.), 270 S.W. 246, wherein the coroner made the autopsy, the court said the beneficiary was not responsible for its having been performed, and that the doing of something to which she did not consent and over which she had no control could not affect her rights.
It is said that the underwriters should have had notice of Dr. Dunlap's examination of the body at the undertaker's. As has been stated, after the coroner had completed his official examination, Reagan's body was transported to an undertaking parlor to be prepared for interment and it was there that Dr. Dunlap first saw the corpse. All Dr. Dunlap did was to *81 reopen the body which had been sewn up by the coroner in order to re-examine the decedent's organs. It is true he removed from the body a portion of the prostate gland which portion of the deceased's anatomy is not involved in the dispute as to what was the cause of death. True, also, no notice of Dr. Dunlap's visit to the undertaking establishment was given to the underwriters, but our opinion is that no such notice was necessary for the simple reason that the procedure employed by Dr. Dunlap could hardly be said to have been such a "surgical examination" as would require notice thereof to the underwriters. Again the insurers are standing on the bald provisions of the policy regarding postmortem surgical examinations without making any showing or without even advancing the contention that what Dr. Dunlap did prejudiced any of their rights, defenses, or interests. We do not think that the provision of the policy regarding notice of post-mortem surgical examinations in themselves was ever intended or can be construed as intending to be a means of escaping liability. The autopsy is but a means of obtaining evidence of the truth. In a case such as this where the circumstances do not indicate any fraudulent withholding of the truth or any likelihood that important evidence was suppressed, the court should be very slow in defeating liability under the contracts because there was no notice of the postmortem surgical examination. See Travelers Insurance Co. v. Welch, 5 Cir., 82 F.2d 799, in which the widow of the insured refused to permit the exhumation of the body on the insurer's demand for an autopsy.
The defendants under the policy (Paragraph "I," Subdivision 1) had the right to make their own post-mortem examination of the body of the assured in order to ascertain the cause of death, but notwithstanding these provisions, the insurer made no attempt to make or call for an autopsy until some months later. Plaintiff's attorney informed DeSonier the day after the death that an autopsy had been ordered by the coroner and that time would be required before its results would be known. It seems to us the defendants' said agent having notice of this, defendants could have readily availed themselves of the right of making their post-mortem examination before interment of the body. The plaintiff herein filed an identical suit in the United States District Court for the Eastern District of Louisiana, New Orleans Division, which we are informed has never been called for trial. In the suit in the federal court, on August 9, 1961, the defendants in said suit, which are the same defendants before us, obtained an order for exhumation and an autopsy of decedent's body (see Labiche v. Certain Ins. Companies, 196 F.Supp. 102) which was performed on August 30, 1961; and the examination of the remains, we think, disclosed a clear and significant compression fracture of the seventh thoracic vertebra. It will do well to remember this.
No one was present at the time Reagan collapsed and died, and there are, of course, no eyewitnesses to testify as to exactly what happened before death occurred. The cause of his death, therefore, must be determined from the foregoing circumstances and from the expert testimony which was adduced at the trial of this case.
The theory of plaintiff's case is that the assured slipped in the bathtub and fell, causing a compression fracture of the seventh thoracic vertebra; that as a result of this slipping and falling, bone marrow and fat emboli from the cracked vertebra were forced into the lungs in such quantities as to block the passage of blood through the lungs, and that the presence of unusual quantities of bone marrow and fat emboli in the lungs was the immediate and proximate cause of the death which, under the circumsatnces, must be classified as accidental.
On the other hand, the defendants vehemently contend that the cause of death was not the presence of massive bone marrow *82 and fat emboli to lungs, but that death was caused by acute laryngeal edema which is a natural cause not produced by accidental means and there can be no recovery in the instant proceedings.
Upon the coroner's autopsy performed by Dr. Samuels, there was no finding by either of these physicians that there had been a fracture of any of the deceased's bones. However, Dr. Chetta, some 7 to 10 days after the death examined the microscopic slides prepared by Dr. Samuels from a number of sections of lung tissue and these showed evidence of bone marrow and fat emboli to the lungs, which Dr. Chetta testified he considered "massive." From the microscopic evidence of bone marrow and fat emboli the coroner concluded that the assured had fallen, bending backwards in the tub in an "opisthotonos position" and suffered an unobserved fracture or fractures which released bone marrow and fat emboli into the circulatory system and that the cause of death was "accidental." He so certified the cause of death in the protocol dated January 12, 1961.
Dr. Dunlap stated that upon his examination of the body he found no fractures but that when he viewed the microscopic evidence of the bone marrow embolism he knew then there was some fracture of a bone. He stated that the only place marrow emanates from is a fractured bone.
Dr. Charles M. Nice, a radiologist with training in pathology and internal medicine, appeared as a plaintiff witness and stated that on the examination held in August 1961, he supervised the taking of 32 X-ray films, a number of them being of the thoracic spine which had been removed from the skeletal remains and that these films showed a fracture of the seventh thoracic vertebral body and perhaps of the sixth thoracic vertebra, as there were some changes in the latter, and that all of this demonstrated that marrow escaped and was pushed into the circulation and that death as a result could be caused almost within a few seconds. According to Dr. Nice, the vertebral fracture could have been sustained by a fall in the bathtub. The fracture was clearly recent and would have caused pain had Reagan lived. He stated the fracture did not result from the attempted artificial respiration or the removal of the body from the bathtub.
From the combined testimony of the plaintiff witnesses, we are convinced bone marrow escaped from the fractured vertebra and that the presence of bone marrow and fat emboli to the lungs could result in almost immediate death.
Dr. Helpern, the chief defense expert, was of the opinion that the fracture in Reagan's back could have been caused by post-mortem manipulation pointing to the removal of the body from the bathtub and the attempts at resuscitation. Evidently this testimony made no impression on the trial judge nor does it appear significant to us because the weight of plaintiff's testimony is that emboli must escape into flowing blood to reach the lungs.
In rebuttal plaintiff produced Dr. Vernie A. Stembridge from Dallas, Texas, a Professor of Pathology at the Southwestern Medical School, as an expert medical witness. Dr. Stembridge testified that "with reasonable medical certainty" it was his feeling that Reagan died as a result of pulmonary bone marrow embolism arising from the compression fracture of the thoracic vertebra. His conclusion was based on his examination of the slides in possession of the coroner. This physician has had much experience in the matter of pulmonary bone marrow embolism arising from fractured bones. Dr. Stembridge has evaluated more than 100 such cases and the experience gained allowed him to evaluate the significance or importance of the bone marrow emboli in Reagan's lungs. The source of much of his experience was gained from material and data forwarded to him from the Armed Forces Institute of Pathology, including autopsy protocols and slides of tissue taken from corpses. The Armed Forces Institute of Pathology, he *83 stated, was established to study aircraft accidents and that "as much tissue as possible, both formalin-fixed and frozen" was sent to the Institute for study. In some instances microscopic slides were prepared at the site of the contributor. Dr. Stembridge also stated that he has never seen any case of bone marrow embolism where there had been no trauma.
Dr. Helpern told of his thirty years' experience in the office of the Chief Medical Examiner of the City of New York where 5000 to 6000 autopsies are conducted annually. His study of Dr. Samuels' autopsy report and slides and his own microscopic slides prepared following the autopsy in August 1961, together with the assured's medical history, indicated to him "with reasonable medical certainty" that Reagan died from acute laryngeal edema which closed off his air passage at the level of the vocal cords causing acute asphyxia. He went on to explain that the microscopic examination of Reagan's larynx definitely indicated an inflammatory process which was present some time before death in a chronic state until the acute stage completed the closure of the larynx and caused death. He stated that the acute stage can come on with great rapidity, resulting in a complete shutting off of the air supply and cause a person to drop dead. He further stated it was impossible to tell whether the compression fracture of the seventh dorsal vertebra occurred before death, while in the throes of death, or after death. He believed the fracture could have occurred in the course of removal of the limp body from the tub or in consequence of a convulsive seizure in the agonal stage of dying from acute asphyxia or simply from the assured losing consciousness or falling by reason of asphyxia. He did not think it occurred from the arching backward of the body as was presumed by the coroner. He pointed out that the intense cyanosis observed by the coroner was entirely consistent with a person who had choked to death from laryngeal edema.
It might be here stated that the coroner and Dr. Dunlap agreed that if laryngeal edema had been the cause of death, Reagan would nevertheless have had time to get out of the bathtub before he died. It is said that a person can live for several minutes with complete stoppage of the air passages as might result from acute laryngeal edema.
Dr. Helpern further stated that bone marrow embolism is not a well-recognized cause of death and that in medical literature there is only one case in which rapid death was attributed to bone marrow embolism, and that he was not satisfied with the explanation offered by the authors of that paper. Counsel for defendants point out that Dr. Dunlap admitted on cross-examination that the mechanism of death from bone marrow embolism "is hypothetical" and that as a cause of death it is "rare," but by the same token Dr. Dunlap stated that while laryngeal edema is medically well recognized, death from such source is also "rare."
Dr. Henry C. McGill, a defense witness, Professor and Chairman of the Department of Pathology of Louisiana State University's School of Medicine, gave his opinion "with reasonable certainty" that Reagan died of laryngeal edema, which produced asphyxiation, and agreed substantially with Dr. Helpern.
Dr. James R. Teabeaut of Augusta, Georgia, who was coroner of Shelby County, Tennessee, for five years and is presently medical examiner for the State of Georgia, testified on behalf of defendants that based on "reasonable medical certainty" Reagan died as a result of laryngeal edema leading to asphyxia, and there is no other "competing cause of death." Dr. Teabeaut reiterated what Dr. Helpern stated that bone marrow embolism to the lungs can be produced even after death by "external manipulation" such as artificial respiration.
Such is the state of the medical experts' evidence which was adduced to help the court solve the enigma in this case.
*84 The trial judge in his well-prepared reasons for judgment stated that he believed that the testimony of the plaintiff's experts was entitled to greater weight than defendants', and his conclusion was that the cause of Reagan's death was bone marrow emboli to the lungs. We agree with this conclusion, but even if we labored under doubt, we think that the findings of our brother below would tip the scales in plaintiff's favor. The assured, we are convinced, died as a result of the fall in the tub and thus by reason of an accident solely and independently of any other cause.
Considerable weight is given by appellate courts to trial courts' views on factual issues, particularly where there is a conflict in the evidence taken at the trial, and the rule is that the appellate court will not reverse the judgment of the trial court if the evidence of the successful party when considered by itself is sufficient to sustain the judgment. Rhodes v. Sinclair Refining Co., 195 La. 842, 197 So. 575.
Appellate courts delve into a case with the presumption before them that the district court judgments are correct and properly decided, so that the burden rests on the appellant to show just the contrary. Perkins v. Buchler, 223 La. 179, 65 So.2d 130; Dupuy v. Iowa Mutual Insurance Co., La.App., 113 So.2d 830; Cush v. Griffin, La.App., 95 So.2d 860; Romero v. Galley, La.App., 79 So.2d 625.
The principle is so well settled in this state as to require no citation of authorities that the trial courts' findings of fact will not be disturbed on appeal unless manifestly erroneous.
In order to decide this case in defendants' favor, we would have to disregard entirely the testimony given by the plaintiff's four expert witnesses and accept in its place and stead the evidence given the court by the experts produced by defendants. We are unwilling to do this. We could never say that the defense witnesses were correct and that the plaintiff's witnesses were wrong. Plaintiff has made out her case by a preponderance of the evidence and there is no manifest error in the judgment.
The judgment appealed from is affirmed.
Affirmed.