OFFSHORE LOGISTICS SERVICES, INC. and Offshore Logistics, Inc.

v.

ARKWRIGHT–BOSTON MANUFACTURERS MUTUAL INSURANCE COMPANY.

Civ. A. No. 77–2079.

United States District Court, E. D. Louisiana, New Orleans Division.

March 8, 1979.

Clayton G. Ramsey, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiffs.

Donald L. King, John J. Broders, Jones, Walker, Waechter, Poitevant, Carrere & Denegre, New Orleans, La., for defendant.

COLLINS, District Judge.

On April 6, 1973, the M/V STONEWALL JACKSON, owned by Offshore Logistics Services, Inc. and operated by Offshore Logistics, Inc. ("OLI") (plaintiffs herein), struck and damaged a production platform in the Gulf of Mexico that was owned by Chevron Oil Company ("Chevron"). In trial on the issue of liability, the Court ruled in favor of Chevron. Before the trial as to quantum, Chevron and the plaintiffs agreed to settle the case for $108,000.

Plaintiffs claim that although their primary Protection and Indemnity underwriters tendered the full amount due under the primary policy, their excess Protection and Indemnity underwriters refused to pay any of the monies owed under the excess policy. As a result, plaintiffs claim to have been forced to pay out of their own pockets $9,865.03 to Chevron in order to effect the settlement and $7,500 in legal expenses and fees. They have brought this suit against defendants for reimbursement and for statutory penalties.

Defendants deny any liability for plaintiffs' loss and contend that the plaintiffs' failure to settle within the limits of the primary policy was arbitrary, capricious and unreasonable.

Trial was before the Court sitting without a jury. Having heard the evidence and considered the briefs and argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law.

1. Plaintiffs' Exhibit A.

2. Plaintiffs' Exhibit B.

FINDINGS OF FACT

1. On April 26, 1973, the M/V STONEWALL JACKSON struck and damaged a production platform in the Gulf of Mexico owned by Chevron. Chevron's damages amounted to at least the $118,227.18 detailed in its list of damages.

2. On May 3, 1973, counsel for OLI recommended to its primary insurer, Market Faculties/Houston, Inc. ("Market Faculties"), that a reserve of $85,000 be established to cover potential liability from the collision. A reserve of $85,000 was established and maintained through the February, 1975 trial. Primary coverage was provided in Policy No. XCOM 12113 ("Primary Policy").[1]

3. Arkwright-Boston Manufacturers Mutual Insurance Company ("ABM") (defendants herein), the excess Protection and Indemnity underwriter for OLI, was notified of the claim by August 2, 1974. Excess coverage was provided by ABM in Policy GCM No. 5150 ("Excess Policy").[2]

4. Both Market Faculties and ABM relied on OLI to conduct negotiations with Chevron prior to the February, 1975 trial.

5. Chevron won the trial as to liability. *Chevron Oil Company v. Offshore General, Inc., et al.,* Civil Action No. 74–863 (E.D.La. June 4, 1975).

6. Before the trial as to quantum, Chevron agreed to settle its claims against OLI for $108,000.

7. In order to effect the settlement, Market Faculties tendered the $100,000 due within the Primary Policy limits.

8. ABM refused to pay the excess portion of the proposed compromise.

9. OLI paid Chevron the $8,000 difference in order to take advantage of the settlement offer.[3]

3. Although plaintiff alleges an overpayment of $9,865.03 in its complaint, the only evidence offered on this point at trial was a xerox

10. ABM refused to pay OLI for any legal fees associated with its defense against Chevron's claim.

## CONCLUSIONS OF LAW

■ 1. OLI is the proper party to sue ABM for its alleged failure to pay the excess portion of the proposed compromise. If, as plaintiffs argue, ABM's failure to pay Chevron under the terms of the Excess Policy was wrongful, the injury was done to Offshore General, Inc. and Offshore Logistics Services, Inc. as insureds under the Excess Policy. It is undisputed that OLI is the legal successor to both Offshore General, Inc. and Offshore Logistics Services, Inc.[4] The assets and liabilities of merging corporations are the responsibility of the surviving corporation. *Travis-Edwards, Inc. v. Texas-Edwards, Inc.,* 299 So.2d 389, 393 (2nd Cir.), *writ of review denied,* 302 So.2d 36 (1974); LSA–R.S. 12:115(D), (E). OLI has the right to sue for monies that may be owed its corporate predecessors.

2. ABM claims that the notice it received on August 2, 1974 was over a year late and that it was prejudiced by such late receipt.

Under the Excess Policy,

"8. The Assured, upon knowledge of any occurrence likely to give rise to a claim hereunder, shall give immediate written notice thereof to the Company." Excess Policy, ¶ 8.

■ In this circuit, "immediate" has been interpreted to mean "reasonable." *See Nat'l Surety Co. v. Wells,* 287 F.2d 102, 106 (5th Cir. 1961) ("transmission within a reasonable time considering all of the circumstances"); *Standard Accident Ins. Co. v. Alexander, Inc.,* 103 F.2d 500, 501 (5th Cir. 1939) ("within a reasonable time"); *Reagan v. Mid-Continent Underwriters, Inc.,* 150 So.2d 75, 79 (4th Cir.), *writ refused,* 244 La. 220, 151 So.2d 692 (1963) ("within a reasonable time or without unnecessary delay and admits of a reasonable excuse for some delay"). But there are limits to how far words will stretch. Notice was given to ABM four months after suit was filed and fifteen months after the original accident. The reserve had been established less than a month after the accident. While it is possible that until suit was filed OLI believed that the claim could be settled for less than $100,000, the Court finds that notice was not given to ABM within a reasonable time.

However, even if the notice is not given within a reasonable time, the burden is on ABM to show that it suffered some prejudice as a result.

"The function of the notice requirements is simply to prevent the insurer from being prejudiced, not to provide a technical escape-hatch by which to deny coverage in the absence of prejudice nor to evade the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid up to the policy limits for which premiums were collected. Therefore, unless the insurer is actually prejudiced by the insured's failure to give notice immediately, the insurer cannot defeat its liability under the policy because of the non-prejudicial failure of its insured to give immediate notice of an accident or claim as stipulated by a policy provision." *Miller v. Marcantel,* 221 So.2d 557, 559 (3rd Cir. 1969).

The record does not support a finding of prejudice. There has been no "loss of evidence or any difficulty raised up in the way of preparing [a] defense." *Young v. Travelers Ins. Co.,* 119 F.2d 877, 880 (5th Cir.

---

of OLI's $8,000 check to its lawyers, Phelps, Dunbar, Claverie & Sims ("Phelps, Dunbar"), Plaintiffs' Exhibit C. Phelps, Dunbar, in turn, paid the $8,000 to Chevron.

**4.** *See* Certificate of Merger, attached to Plaintiffs' Reply to Defendants' Post-Trial Brief.

Moreover, OLI was itself a named insured in the Primary Policy, Endorsement No. 1, ¶ 14. Plaintiffs' Exhibit A. Note that the Receipt and Release was executed on behalf of Offshore General, Inc., Offshore Logistics Services, Inc., *and* Offshore Logistics, Inc.

1941). Although, "speaking in terms of physical time, the notice could reasonably have been given sooner than it was," the record indicates that ABM never complained of any difficulty in locating witnesses, examining data, etc. because of the delay. *Id.* While OLI might consider changing its practices in order to insure prompt notice to its excess carriers, this Court refuses to find prejudice when defendants did not even attempt to prove that the notice given was "inadequate to permit [ABM] to investigate and exercise, if it so elected, the rights reserved to it under the policy." *Greyhound Corp. v. Excess Ins. Co. of America,* 233 F.2d 630, 636 (5th Cir. 1956). *See Hague v. Liberty Mutual Ins. Co.,* 571 F.2d 262, 267 (5th Cir. 1978); *Offshore Logistics Services v. Mutual Marine Offices, Inc.,* 462 F.Supp. 485, 495 (E.D.La. 1978), *modified in part,* December 14, 1978 and February 21, 1979 (unpublished).

■ 3. The collision between the M/V STONEWALL JACKSON and Chevron's fixed platform was covered by the Primary Policy.[5] ABM contends that the Excess Policy, however, did not cover the collision.

Under the Excess Policy ABM contracted "to indemnify the Assured for all sums which the Assured shall become legally obligated to pay for liabilities described in and insured against under the Protec-

tion and Indemnity policies specified in the schedule of underlying insurances . . . .." Excess Policy, ¶ 2(a). The Primary Policy is listed on the "Schedule of Underlying Insurance." Excess Policy, ¶ 2. The Court finds that the Excess Policy was meant to cover the same liabilities that were covered by the Primary Policy. The collision, therefore, was covered by ABM's Excess Policy.

4. ABM's primary defense to payment is that OLI arbitrarily and in bad faith failed to settle the claim within the limits of the Primary Policy. *Ward v. State Farm Mutual Automobile Ins. Co.,* 589 F.2d 1044, 1049 (5th Cir. 1976); *Cousins v. State Farm Mutual Automobile Ins. Co.,* 294 So.2d 272, 275–6 (1st Cir. 1974).

Both the Fifth Circuit and Louisiana have long used a "good faith" test in determining insurer accountability for failure to settle.[6]

"Under Louisiana law an insurer may be liable for an excess judgment against its insured if it is found that the insurer's failure to settle within policy limits was arbitrary or in bad faith." *Ward, supra* at 1049, using the language of *Cousins, supra,* 294 So.2d at 275.[7]

*See also Manieri v. Horace Mann Mut. Ins. Co.,* 350 So.2d 1247, 1248 (La.App. 4th Cir. 1977); *Younger v. Lumbermans Mut. Cas.*

---

5. The Primary Policy states:

"The Assurer hereby undertakes to make good to the Assured or the Assured's . . . successors, all such loss . . . and/or expenses as the Assured shall as owners of the vessel . . . become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth: . . . . (6) Liability for damage to any . . . fixed . . . object or property whatsoever . . . .." Primary Policy, Preamble and ' 6.
The M/V STONEWALL JACKSON was a named insured of the Primary Policy.

6. For the Fifth Circuit, "[the] first contact with the general problem" was in *American Mut. Liab. Ins. Co. v. Cooper,* 61 F.2d 446, 448 (5th Cir. 1932) ("duty . . . to act honestly and in good faith"), according to the author of *Fidelity & Cas. Co. v. Robb,* 267 F.2d 473, 476 (5th Cir. 1959). *See also Hernandez v. Employers Mut. Ins. Co.,* 346 F.2d 154, 155 (5th Cir.

1965); *Hall v. Preferred Accident Ins. Co.,* 204 F.2d 844, 847 (5th Cir. 1953).

7. A primary insurer owes the same duty to the excess insurer that it owes to its insured.

" 'Under the doctrine of equitable subrogation, the duty owed an excess insurer is identical to that owed the insured. The excess will not be able to force the primary into accepting any settlement which his duty to the insured would not require accepting.' " *Valentine v. Aetna Ins. Co.,* (quoting from *Peter v. Travelers Ins.,* 375 F.Supp. 1347 (C.D.Cal.1974).
*See also* R. Keeton, *Insurance Law* ¶ 7.8(d), at 5 (1971); *Cont'l Cas. Co. v. Reserve Ins. Co.,* 238 N.W.2d 862, 864 (Minn.1976). OLI conducted the settlement negotiations with Chevron on behalf of *both* the primary and the excess carriers. OLI is, in effect, defending Market Faculties' decision to accept OLI's settlement negotiations—i. e. OLI is defending the primary insurer's behavior.

*Co.,* 174 So.2d 672, 674–5 (La.App. 3rd Cir. 1965) (*citing* Appleman, *Insurance Law & Practice* ).[8]

On the other hand,

"A liability insurer is not required to settle a claim against its insured within the policy limits, under penalty of absolute liability for any excess judgment which may be rendered against the insured." *Champion v. Farm Bureau Ins. Co.,* 352 So.2d 737, 740 (La.App. 3rd Cir. 1977), *writ refused* 354 So.2d 1050 (1978).

▪ Determining what constitutes bad faith "depends on the facts and circumstances of each case . . ." including "whether the proposed settlements are rejected conscientiously in terms of deliberate judgment evaluation rather than for inadequate or no reason." *Id.*[9] Among the factors to be considered are the likelihood of recovery by the claimant, the likelihood of a judgment in excess of the policy limits, the risk of exposing the insured to a large liability during litigation rather than choosing settlement, and the adequacy of the insurer's investigation of the claim. *Ward,* 539 F.2d at 1049, *Cousins,* 294 So.2d at 275.

"The question under the good faith doctrine is whether . . . the Insurer acted in good faith in failing to settle within the policy limits. By its very nature that question encompasses the more specific ones concerning the reasonable valuation of the case . . . ." *Smoot v. State Farm Mut. Auto. Ins. Co.,* 299 F.2d 525, 531 (5th Cir. 1962).

Neither side has provided this Court with much evidence as to the initial accident investigation. OLI has described as a complete surprise Captain Aucoin's testimony that he saw the platform before he ran into it. Plaintiff's Reply Memorandum, at 6.

Rather, OLI had expected him to say that he ran into it because he could not see it. OLI could then have argued that Chevron's failure to light the platform adequately contributed to the accident.

"[An insurer] is not required to prophesy or foretell the results of litigation at its peril. If it acts in good faith and without negligence in refusing the proffered settlement, it has fulfilled its duty to its insured, and those in privity with it." *St. Paul-Mercury Indem. Co. v. Martin,* 190 F.2d 455, 458 (10th Cir. 1951).

Until the trial, therefore, OLI's counsel could honestly have believed that there was a chance that Chevron was equally liable.

Mr. Rufus Harris, Jr., Chevron's counsel, testified that he had been willing to settle the case for $86,000 (the last offer before the parties went to trial), but that OLI had been unwilling to pay more than $75,000. However, once Chevron had won on the liability issue, Mr. Harris refused to settle for less than $108,000. Mr. Harris stated that he did not think OLI had acted either arbitrarily or capriciously in resisting the $86,000 figure during the negotiations.

Mr. Donald King was hired in late November, 1974 to protect ABM's interests. He testified that he had encouraged OLI to settle within the limits of the Primary Policy both because of the legal presumption of fault against a moving vessel that hits a stationary object and because of Chevron's detailed list of damages. However, Mr. King admitted that he had taken no part in the negotiations, had not helped to take depositions or prepare interrogatories and had exchanged only a few letters with Mr. Roussel, OLI's counsel, during the course of the settlement discussions. He stated that

---

8. This duty may be expanded in future cases. The Louisiana Supreme Court has recently indicated in dictum that more may be required than the "minimum duty to act in good faith and deal fairly." *Holtzclaw v. Falco, Inc.,* 355 So.2d 1279, 1284 (La.App.1978) (footnotes omitted). While declining to engage in "a full delineation of the duty," it noted that some recent Louisiana cases were "consistent with a trend in other jurisdictions which has elevated the insurer's duty to act in good faith to an

obligation of due care, and, perhaps, even strict liability." *Id.*

9. One court has described it as follows: " 'Bad faith embraces more than poor judgment or negligence, it imports a conscious wrong doing, a breach of a duty through some ulterior motive. . . . Bad faith is never presumed, bad faith must be proven.' " *Hernandez,* 346 F.2d at 155, *citing* trial court's jury charge.

he believed OLI's failure to settle was the result of legal bad faith. The Court finds that Mr. King's involvement with the case was tangential. ABM chose to rely on Mr. Roussel during the negotiations and to delegate its responsibility to him. An argument of legal bad faith must be based on something more than the self-interested testimony of a company agent.

Moreover, the fact that the reserve was established at $85,000 supports the argument that OLI believed that the claim would be settled for less than $100,000. In fact, it seems likely that a defendant would establish a reserve at a little *more* than it actually thought necessary, just to be on the safe side. The Court finds that OLI believed in good faith that the claim could and should have been settled at about $75,-000.

Furthermore, the final compromise exceeded the Primary Policy by $8,000—about 8% of the settlement figure. If OLI had settled the claim for the full $118,227.18 that Chevron detailed in damages, it would not have been a "large liability" on a policy that had $900,000 limits. *Ward,* 539 F.2d at 1049. It is interesting that Market Faculties has not complained that OLI settled for $14,000 over the final Chevron offer of $86,-000—even though the extra $14,000 that Market Faculties paid was almost twice ABM's alleged injury. ABM may think OLI would have been wiser to settle at $86,000, but that is the wisdom of hindsight. The Court finds that OLI's decision not to pay more than $75,000 was not arbitrary or capricious.

ABM was under a contractual duty to pay all settlement funds in excess of $100,000. Since ABM had notice of the claim and since this Court has found that OLI did not arbitrarily and capriciously fail to settle the claim within the limits of the Primary Policy, ABM's failure to pay the $8,000 to Chevron breached its contract with OLI.[10] The Court finds that ABM is liable to OLI for $8,000 plus interest at 7% from July 5, 1977.[11]

### ATTORNEYS' FEES

5. The Primary Policy covers

"(14) Costs, charges and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein . . . ."

The Court finds that OLI did incur expenses defending the original suit. The Primary Policy covered attorneys' fees and would have been put to that use if the settlement had not exhausted the Policy's limits. *Board of Commissioners v. Guidry,* 425 F.Supp. 661 (E.D.La.), *aff'd* 564 F.2d 95 (5th Cir. 1977). Since ¶ 2(a) of the Excess Policy expressly promises to pay for all liabilities described in the Primary Policy, OLI wishes to be reimbursed for the attorneys' fees it paid Phelps, Dunbar.

ABM argues that it is excused from paying attorneys' fees under ¶ 3 of the Excess Policy, which states

"The Company shall not be called upon to assume charge of the settlement or defense of any claim made or suit brought or proceeding instituted against the Assured, but the Company shall have the right and shall be given the opportunity (without incurring any liability for costs or expenses thereof except as hereinafter provided) to associate with the Assured or the underwriters on the Primary Policies, or both, in the defense and control of any claim, suit or proceeding which involves or appears likely to involve the Company, in which event the Assured, the underwriters on the Primary Policies and the Company shall cooperate in all matters in

---

10. ABM argues that whatever sum it does owe should be reduced by the $5,000 deductible of the Primary Policy. But the record is silent as to whether the deductible has been refunded to the primary insurer since October 9, 1975. ABM would have the Court assume that OLI and Market Faculties have not adjusted their bookkeeping since the signing of the Receipt and Release. The Court declines to do so.

11. Interest does not begin until judicial demand. *Degelos Bros. Grain Corp. v. Fireman's Fund Ins. Co.,* 498 F.2d 1238, 1240 (5th Cir. 1974).

the defense of such claim, suit or proceeding."

The Court finds that this paragraph does not relieve ABM of liability for attorneys' fees.

ABM was not called upon to assume charge of the settlement—it is ABM's self-imposed *absence* from the final settlement negotiations which is the basis of this suit. Nor was ABM called upon to assume the defense of the OLI/Chevron suit. ABM *wanted* OLI to handle the management of the case. ABM's complaint is with the outcome of OLI's negotiations, not with the fact that OLI's, rather than ABM's, counsel conducted them. Therefore, they cannot now seek to characterize their limited role as assumption of OLI's defense in order to extricate themselves from their contractual obligations.

A more serious problem arises with the phrase ". . . the Company shall have the right and shall be given the opportunity (without incurring any liability for costs or expense thereof except as hereinafter provided) to associate with the Assured . . in the defense and control of any claim, suit or proceeding . . . ." [12] The phrase is ambiguous when read together with the promise in ¶ 2(a) to pay for "*all* sums which the Assured shall become legally obligated to pay . . . ." (Emphasis added.)

The phrase in ¶ 3 can be read as a disclaimer of any obligation for attorneys' fees for defense of a suit, except if ABM chooses to appeal an excess judgment. However, it can also be read "as merely freeing [ABM] from the obligation to direct the defense of a claim, while reserving its right to associate its own counsel if it chooses to do so." *Offshore Logistics Services, Inc. v. Mutual Marine Office, Inc.,* 462 F.Supp. 485 (E.D. La.1978) (interpreting the same paragraph). In that decision, Judge Sear held that the Excess Policy did obligate ABM to pay for

the costs and expenses of defending *and settling* a suit. *Id.* at 2.

An ambiguous insurance policy "should be construed against the insurer who wrote it and should be read liberally so as to indemnify the insured." *Walter v. Marine Office of America,* 537 F.2d 89, 95 (5th Cir. 1976) (construing Louisiana law) (footnotes omitted); *Calcasieu—Marine National Bank v. American Employers' Insurance Co.,* 533 F.2d 290, 295 (5th Cir.), *cert. denied,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *Ory v. Louisiana & Southern Life Insurance Co.,* 352 So.2d 308, 310 (La. App. 4th Cir. 1977); *Gregorie v. Hartford Accident & Indemnity Co.,* 348 So.2d 186, 191 (La.App. 3rd Cir.), *writ denied* 350 So.2d 1210 *and* 350 So.2d 1213 (1977).

█ In the face of ambiguity, the interpretation "sustaining indemnity will be adopted." *Ory,* 352 So.2d at 310. Attorneys' fees are a significant part of the "expense" usually associated with an insurance claim of this kind and referred to in the Primary Policy's Preamble. It is reasonable to assume that a fair-sized corporation and a large insurance company knew that each would call on its own lawyers as soon as an accident occurred. If ABM had wanted to preclude payment for lawyers' services, it could have done so much more clearly.[13] Construing the paragraph most favorably to the insured, this Court finds that it was not meant to exclude attorneys' fees incurred by a policy holder who was defending a suit covered by the Primary Policy.

6. OLI has made a claim for $7,500 in attorneys' fees, costs and expenses. ABM argues that even if it is liable for attorneys' fees, there is insufficient or nonexistent evidence in the record as to how much was actually paid to Phelps, Dunbar.

---

**12.** The "hereinafter" refers to ' 4 of the Excess Policy in which ABM promises to be wholly liable for the costs of any appeal it takes from a judgment in excess of the Primary Policy limits.

**13.** For example, it could have disclaimed liability by placing attorneys' fees under the paragraph which is headed (in heavy type) "Provided, however, that no liability shall exist under this provision for:" and which is followed by thirteen subparagraphs describing excluded items. Excess Policy, at 1.

"It is an elementary rule of law that one who asserts a fact must carry the burden of proof of that fact and the fact must be established by a reasonable preponderance of the evidence." *Meyer v. Louisiana,* 312 So.2d 289, 292 (La.App.1975).[14] *See also Newsom v. Temple,* 66 So.2d 357, 358–9 (La.App.1953); *Jory v. Arnette,* 360 So.2d 921, 924 (3rd Cir. 1978).

Mr. E. B. Mercer, III, plaintiff's insurance agent, was the only witness who testified as to the actual amount paid by OLI to Phelps, Dunbar for attorneys' fees. The Court finds it necessary to quote certain relevant portions of Mr. Mercer's testimony.

"Q. Do you know, Mr. Mercer, whether or not Offshore Logistics was billed for services of this type by Phelps, Dunbar for services provided to that company as a result of this casualty?

A. Yes.

Q. Do you know the amount of the bill?

A. Approximately $6000., as I recall."

Asked about additional costs, he answered

"A. Let's see. There was one notation of approximately $1800. and some odd dollars.

Court: Did you get a bill from Phelps, Dunbar?

A. No, sir, I did not personally. My client, Offshore Logistics did and it was made known to me."

Mr. Mercer then added that there had been additional expenses "running in the neighborhood of three to four hundred dollars."

Mr. King elicited the following on cross-examination.

"Q. As I understand it, Mr. Mercer, no bills for fees or expenses were submitted to either you personally or to your firm for payment, is that right?

A. That's right.

Q. And you personally, nor your firm, paid any such bills, is that right?

A. That's right."

Plaintiff's counsel, despite the repeated objections made by Mr. King as to Mr. Mercer's lack of any first-hand knowledge about attorneys' fees, never asked Mr. Mercer exactly where he learned about them. This information was a necessary foundation for Mr. Mercer's testimony. There was no redirect to show the basis of his knowledge.

The Court refuses "to follow the primrose path to *post hoc ergo procter hoc* reasoning" in this case. *Dreijer v. Girod Motor Co.,* 294 F.2d 549, 555 (5th Cir. 1961). It might not be unreasonable to assume that Mr. Mercer heard or saw something in his business dealings with OLI that would sustain his statement. We might suppose that he saw a check with "Attorneys' fees" written on it or that he was told by a Phelps, Dunbar attorney how much the firm had been paid. But he did not tell the Court any of this—the *factual basis* of his testimony—and to guess at it would be wrong.

" 'Jurors are repeatedly charged that their verdicts cannot be based upon speculation or conjecture. The court in a non-jury case must be guided by the same principle.' " *Hanson & Orth, Inc. v. M/V Jalatarang,* 450 F.Supp. 528 (S.D.Ga. 1978), *citing Jaramillo v. United States,* 357 F.Supp. 172, 175 (S.D.N.Y.1973).

A court can certainly base its decision— and a plaintiff could sustain its burden of proof—by relying on reasonable inferences. But an inference—and carrying a burden of proof—must be based on *facts,* not speculation or conjecture.

"An inference, however, must be supported by evidence of sufficient probative value to form a rational basis for the court's conclusion; it must be drawn by reason from the facts on which it purports to rest. An inference is not a surmise or conjecture." *Id.*

■ To award nearly $10,000 on the basis of such tenuous testimony would be unjust.

14. The rule requires that the burden of proof in diversity cases be allocated according to state law. *Parker Supply Co. v. Travelers Indemnity Co.,* 588 F.2d 180, 182, n.1 (5th Cir. 1979). However, the Fifth Circuit applies the same burden of proving, by a preponderance of the evidence, the existence of a fact. *See Marcum v. United States,* 452 F.2d 36, 39 (5th Cir. 1971).

Mr. Mercer's figures were not specific—according to his recollection "approximately" and "in the neighborhood" of $8000. was paid. Plaintiffs could have easily produced their check to Phelps, Dunbar, its receipt, or some other documentary evidence. They could also have put on a witness with a more substantial relation to OLI's internal finances. They chose not to do so. The Court finds that OLI did not sustain its burden of proving how much was paid in attorneys' fees.[15]

## PENALTIES

7. Louisiana insurers must pay claims of this sort within sixty days after receipt of satisfactory proof of loss from the insured.

> "Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured . . . together with all reasonable attorney's fees for the prosecution and collection of such loss . . ."

LSA–R.S. 22:658 (1959).

The Court finds that ABM did receive satisfactory proof of loss from OLI. ABM knew that OLI had lost the trial on liability. ABM knew about the proposed Receipt and Release with Chevron and refused to pay the funds necessary for its consummation. Proof of loss does not need to be put in writing, *Youngblood v. Allstate Fire Ins. Co.*, 349 So.2d 462, 465 (La.App. 3rd Cir. 1977), although it was in this case *via* the Receipt and Release. All that is required is that the insurer had actual knowledge of "the nature and amount of the claim." *Benoit v. American Mut. Ins. Co.*, 236 So.2d 674, 677 (La.App. 3rd Cir.), *writ denied* 256 La. 874, 239 So.2d 366 (1970). *See Humphries v. Puritan Life Ins. Co.*, 311 So.2d 534, 539 (La.App. 3rd Cir. 1975); *Gatte v. Coal Operators Cas. Co.*, 225 So.2d 256, 258 (La.App. 3rd Cir. 1969), *reversed on other*

*grounds*, 236 So.2d 485 (1970). It has even been held that a plaintiff need not submit any proof of loss where the insurer has already refused payment of the loss. *Riddle v. Allstate Ins. Co.*, 203 So.2d 820, 824 (La.App. 4th Cir. 1967).

ABM knew the nature and amount of Chevron's claim against OLI. It knew that the case had been settled even after it refused to contribute the $8,000, and it certainly knew the exact amount of OLI's loss by July, 1977 when this suit was filed. The Court finds that ABM received satisfactory proof of OLI's loss.

Was ABM's failure to pay the $8,000 arbitrary, capricious, or without probable cause?

> "Under Louisiana law, the failure of an insurer to pay a claim based solely on the insurer's incorrect interpretation of language in the policy it wrote is *deemed* to be arbitrary, capricious and without probable cause. Even if the language in question has never been litigated before, the risk of erroneous interpretation is that of the insurer, not the insured. Further, the insurer must be held to the knowledge that any ambiguity in the policy will be interpreted in favor of the insured. Considering this rule of interpretation, the insurer's failure to pay a claim unless it is clearly and unambiguously excluded by the policy is without probable cause." *Gulf Oil Corp. v. Mobile Drilling Barge or Vessel*, 441 F.Supp. 1, 13 (E.D.La.1975), *aff'd.* 565 F.2d 958 (1978) (citations omitted) (emphasis added).

*See also Aetna Cas. & Sur. Co. v. Louisiana Nat'l Bank*, 399 F.Supp. 54, 57 (M.D.La. 1975); *Reichert v. Continental Ins. Co.*, 290 So.2d 730, 735 (La.App. 1st Cir.), *writ denied* 294 So.2d 545 (1974). However, "where the insurer's failure to pay is motivated by a *reasonable* disagreement regarding the single issue of the amount of damages due, such failure to pay may not be characterized as arbitrary, unreasonable or without probable cause within the meaning of the terms as employed in LSA–R.S.

---

15. Since plaintiff did not meet its burden of proof on the issue, defendants were under no obligation to introduce evidence to "contradict" an unproven story.

22:658." *Ranzino v. Allstate Ins. Co.*, 210 So.2d 907, 911 (La.App. 1st Cir. 1968) (emphasis added).

The issue, therefore, is the basis of ABM's refusal to pay. ABM refused to pay because it did not agree with the settlement figure arrived at by OLI and Chevron. It did not dispute that OLI was liable—it did dispute the amount for which OLI ought to *admit* liability. It could not have believed that Chevron, having won the trial as to liability and having agreed to accept $108,000, would accept a lesser figure merely because ABM was balking. Instead, the danger (as OLI realized) was that ABM's refusal to pay might have forced OLI to trial where judgment could have exceeded $108,000.[16]

"LSA–R.S. 22:658 is a penal statute, which is strictly construed. However, an insurer must have a reasonable basis to refuse payment of a claim." *Youngblood,* 349 So.2d at 465. *Steadman v. Pearl Assurance Co.*, 167 So.2d 527, 531 (La.App. 4th Cir.), *cert. denied* 246 La. 911, 168 So.2d 822 (1964) ("The words arbitrary and capricious are practically synonymous and mean without reasonable cause . . . .") "Whether the insurance company's refusal to pay [is] so lacking in foundation or cause as to fall within the terms of the statutory penalty is primarily a question of fact." *Reliance Ins. Co. v. Orleans Parish School Bd.*, 322 F.2d 803, 809 (5th Cir. 1963), *cert. denied*, 377 U.S. 916, 84 S.Ct. 1180, 12 L.Ed.2d 186 (1964). It is, in the end, a question within the court's discretion to interpret these terms. *Gauthier v. Employers Nat'l Ins. Co.*, 316 So.2d 769, 777 (La.App. 1st Cir. 1975).

█ ABM refused to pay the $8,000 even though Judge Boyle had found OLI liable. After holding aloof during the months of OLI/Chevron negotiations, ABM refused to contribute to a settlement which this Court has found was compromised in good faith by OLI's attorneys. This refusal to honor the express promises of the Excess Policy was unreasonable, arbitrary and capricious. Moreover, ABM then refused to pay for any attorneys' fees, based on an interpretation of the Excess Policy which this Court has found to be erroneous. As was stated above, an insurer's incorrect interpretation of a contract "is deemed to be arbitrary, capricious and without probable cause." *Gulf Oil Corp.*, 441 F.Supp. at 13. Both the refusal to pay the $8,000 and the refusal to pay reasonable attorneys' fees are each sufficient to call LSA–R.S. 22:658 into play. However, since OLI has failed to prove how much, if anything, was paid in attorneys' fees, the penalty will only be assessed on the $8,000. The Court will, therefore, assess a penalty of 12% damages on the $8,000 due, or $960.

█ Plaintiff is also entitled to a reasonable attorneys' fee under LSA–R.S. 22:658. Plaintiff's counsel attended three pre-trial conferences, prepared one pre-trial order and two post-trial memoranda and participated in a two-hour trial. The Court has considered the amount involved in the controversy, the complexity of the issues and the length of the trial. *State Farm Fire & Cas. Co. v. McFerrin*, 382 F.2d 282, 283 (5th Cir. 1967), *cert. denied*, 390 U.S. 953, 88 S.Ct. 1045, 19 L.Ed.2d 1145 (1968). Given the amount of time and effort that was involved in this litigation, the Court finds that $1,250 is a reasonable attorneys' fee.

Judgment will be entered on behalf of OLI and against ABM for (1) $8,000, plus interest at 7% from July 5, 1977, owed under the Excess Policy, (2) $960, owed in penalties under LSA–R.S. 22:658 (1959) and (3) $1,250, for reasonable attorneys' fees owed under LSA–R.S. 22:658 (1959).

---

**16.** The refusal to pay was, in fact, counterproductive. If the settlement had not been effected, OLI could have been held liable for the entire $118,227.18—and ABM, as the excess carrier, would have been liable for more than twice the $8,000—$18,227.18, plus interest.